561 So.2d 1378 (1990)
Edward C. MAXWELL, Curator of the Interdict, Marguerite Fern McMichael Maxwell, Plaintiff/Appellant,
v.
Dr. M.K. SOILEAU, et al., Defendants/Appellees.
No. 21433-CA.
Court of Appeals of Louisiana, Second Circuit.
May 9, 1990.
Rehearing Denied June 14, 1990.
*1380 Campbell, Campbell & Johnson by John C. Campbell, Minden, for plaintiff/appellant.
Mayer, Smith & Roberts by Paul R. Mayer, Jr. & Paul R. Mayer, Shreveport, for defendants/appellees.
*1381 Before HALL, FRED W. JONES, Jr., and HIGHTOWER, JJ.
FRED W. JONES, Jr., Judge.
Plaintiff, Edward Maxwell, Curator of the Interdict, Marguerite Maxwell, appealed from a judgment ruling that defendants, Dr. Marvin Soileau and Doctors Clinic of Springhill, were not liable in plaintiff's action for damages due to defendants' alleged medical malpractice. Finding that the judgment is contrary to the law and evidence, we reverse.
Issues Presented
On appeal, plaintiff asserts the following assignments of error:
1) The form of the decision of the medical malpractice review panel was improper and the panel erred in rendering such a decision. Further, the trial court erred in allowing the panel's decision to be admitted into evidence;
2) The verdict rendered by the jury was contrary to the law and evidence; and,
3) The trial court erred in its instruction to the jury when it defined the term "proximate cause".
Factual Context
On March 1, 1985 Marguerite Maxwell was admitted into Humana Hospital in Springhill complaining of severe headaches with nausea and vomiting. At that time, Mrs. Maxwell was 57 years old and had been in good health. Dr. Marvin Soileau was her primary treating physician. Mrs. Maxwell was hospitalized until March 5, 1985 and during her hospitalization, various tests were conducted. While hospitalized, she received D-5-W fluid, a solution of 5% dextrose in water, intravenously and was also administered 25 mg. of hydropres, a mild high blood pressure medication. Mrs. Maxwell continued to suffer from severe headaches with nausea and vomiting and was transferred to Willis-Knighton Hospital in Shreveport to be under the care of Dr. Ellis Cooper. While hospitalized in Springhill, Dr. Soileau never conducted tests to determine Mrs. Maxwell's level of sodium and potassium electrolytes. Upon her arrival at Willis-Knighton, it was found that Mrs. Maxwell's sodium level was at a life-threatening low level of 96. The normal sodium level should be approximately 140. This condition of a low serum sodium level in the blood is known as hyponatremia. Dr. Cooper immediately began to administer IV sodium infusions raising Mrs. Maxwell's sodium level to 122 in a six hour period at the rate of 4.3 milli-equivalents per hour, which was twice the recommended rate. Soon after this treatment, Mrs. Maxwell appeared to be improving. However, within a short time after the rapid rise in the sodium level her condition deteriorated. She continued to be hospitalized with no improvement in her condition and was eventually allowed to return home. The record demonstrates Mrs. Maxwell sustained severe brain damage, rendering her unable to communicate with others or to move around and function in a normal manner. Her condition was eventually diagnosed as central pontine myelinolysis (CPM), a permanent brain disorder caused by damage to the pons of the brain stem, as well as other diffuse brain damage.
On March 3, 1986 plaintiff, the curator-husband of Mrs. Maxwell, filed this action for damages due to alleged medical malpractice naming as defendants, Dr. Soileau and Doctors Clinic of Springhill.
The medical malpractice review panel issued an opinion on June 31, 1987. The panel was composed of Drs. Daniel Moller, Robert Bays and James Wilson. The opinion indicated Dr. Bays found the evidence did not support the conclusion that defendants failed to meet the standard of care. Dr. Bays found that although serum electrolyte tests should have been performed and D-5-W should not have been given, these deviations from ideal practice patterns were not outside the range of usual standards of care of family practitioners in a community hospital and the conduct complained of probably did not have a significant *1382 effect on the ultimate outcome of the case. Drs. Wilson and Moller found the evidence did support the conclusion that defendants failed to meet the standard of care as a serum electrolyte test should have been performed at or near the time of Mrs. Maxwell's admission to the hospital and the administration of D-5-W without periodic assessments of serum electrolytes was inappropriate. However, the physicians stated that they could not determine from the evidence submitted that these deviations had a significant effect on her subsequent condition.
At the trial on the merits, each of the physicians from the medical review panel testified as well as other treating physicians and medical experts. Much of the evidence centered upon whether the hyponatremia had caused Mrs. Maxwell's brain damage or whether it was caused by the rapid correction of this condition by Dr. Cooper. The testimony of the medical experts established that the administration of D-5-W and hydropres without the periodic assessment of electrolytes was inappropriate, particularly when a patient was vomiting.
Dr. James Wilson, an internist, testified he had served on the medical malpractice review panel. Dr. Wilson indicated the Physicians' Desk Reference warned that a periodic determination of serum electrolytes to detect the possibility of an electrolyte imbalance, including hyponatremia, should be performed at appropriate intervals in connection with hydropres. These determinations are particularly important when the patient is vomiting excessively or receiving fluids. Dr. Wilson testified that Mrs. Maxwell's serum electrolytes should have been monitored at least once every few days and the administration of D-5-W without such monitoring was inappropriate. Dr. Wilson indicated Mrs. Maxwell's sodium level of 96 was a very significantly low reading which could be life-threatening. Dr. Wilson stated the most common and serious problems resulting from low sodium were changes and impairment of the central nervous system. He stated it was a reasonable assumption that Mrs. Maxwell's treatment in Springhill contributed to her sodium level being diminished. Dr. Wilson stated there had been reports in medical literature of serious brain damage resulting from low sodium. He stated there were no established guidelines for the correction of low sodium and believed the decision as to the correction would be within the judgment of the physician based upon the patient's condition.
Dr. Dan Moller, an internist, testified he had served on the medical malpractice review panel. He stated that the hydropres administered to Mrs. Maxwell did act as a diuretic. Dr. Moller noted the warnings as to the determination of serum electrolytes in connection with the administration of this drug and testified it was good basic medicine to be familiar with and aware of these warnings. He testified that a patient's serum electrolytes should be tested once a day or perhaps once every twelve hours but certainly no less than every other day if the patient was ill and receiving IV fluids. Dr. Moller stated the administration of the hydropres coupled with vomiting and D-5-W would be something that would lower the serum sodium level and that Mrs. Maxwell's extremely low sodium level of 96 upon admission to Willis-Knighton presented a dangerous life-threatening condition. He stated if a determination of these electrolyte levels had been made, the choice of IV fluids would probably have been different. Dr. Moller testified that serum sodium of 110 or less is typically treated with hypertonic saline, which is salt water that is in more powerful concentrations than present in the body, in an effort to bring the sodium up quickly. Dr. Moller stated it is not recommended to bring sodium levels up very rapidly if the serum level is relatively normal. Thus, the closer toward normal, the more gradual the correction. At levels of 96, which is considered life-threatening, the goal is to get it above 110 quickly. Dr. Moller stated in order to raise a level from 96 to 120, a physician should take three or four days as generally *1383 anything less than that could cause complications, such as a cerebral edema, seizures, convulsions, brain damage and death. Dr. Moller asserted that the amount of brain damage that could occur from rapid correction would increase proportionately with the rapidity of the correction. He testified that not many patients with such low serum sodium levels survived and, therefore, he could not say whether the hyponatremia or the rapid correction of that condition was the cause of the brain damage. Dr. Moller stated that the treatment Mrs. Maxwell received in Springhill did contribute to her diminished serum sodium level and he did not believe she had a sodium level of 96 upon her admission at Springhill since she would not have lived for five days with the treatment received by her. However, she could have been admitted with diminished serum sodium levels.
Dr. Robert Bays, an internist, testified he was a member of the medical malpractice panel. In his opinion serum sodium tests should have been performed when Mrs. Maxwell was admitted to the hospital and D-5-W should not have been administered until such tests. However, he did not feel this was outside the range of usual standards of care of family practitioners in the primary care of a general community hospital and the treatment given by Dr. Soileau was not below the standard of care of general family medicine practitioners in a primary care hospital. Dr. Bays stated it was probable that Mrs. Maxwell was hyponatremic upon her admission in Springhill but he believed the actions of Dr. Soileau probably did lower her sodium level.
Dr. Mark Pretorius, a neurologist, testified he first saw Mrs. Maxwell following her injury. Mrs. Maxwell had trouble with understanding speech, even simple words. She spoke as if she were drunk or had markedly slurred speech. Further, she had difficulty in walking, a tremor affecting her arms and difficulty with coordinated movements in both arms. Dr. Pretorius performed an MRI scan which gives a picture of the brain tissue and this test was abnormal. He concluded Mrs. Maxwell had two separate problems, CPM and a diffuse brain injury which was most likely secondary to the hyponatremia. Dr. Pretorius believed Mrs. Maxwell was suffering from hyponatremia at the time she entered Willis-Knighton and her level of 96 was the lowest one he had ever come in contact with. He asserted her hyponatremia was related to the IV fluids and diuretic she received during her hospitalization along with the recurrent nausea and vomiting. Due to these factors, Dr. Pretorius stated that Mrs. Maxwell's electrolytes should have been checked when she was admitted into the hospital and then checked again in at least two or three days later. Dr. Pretorius stated that Mrs. Maxwell's low sodium reading was more probably than not caused by sub-standard treatment she received from defendant. Dr. Pretorius opined that the CPM stemmed from corrective measures taken by Dr. Cooper. He stated there was an area of controversy as to the correction of sodium levels but if the deficiency had not been corrected, Mrs. Maxwell would have gone into convulsions and possibly died. The original injury, hyponatremia, necessitated further medical treatment which was the rapid correction. Dr. Pretorius saw Mrs. Maxwell approximately a year from her first treatment by defendant and believed she had reached her maximum level of recovery. He did not believe her condition was going to improve any more than a minimal amount and stated he did not think anyone could say with 100% accuracy as to whether Mrs. Maxwell's diffuse injury was caused by the hyponatremia or the rapid correction. Dr. Pretorius testified medical literature indicated that low sodium itself could cause diffuse brain injury but it had also been reported that the rapid correction of this condition could also cause this injury. Dr. Pretorius stated that his belief that the hyponatremia itself had caused Mrs. Maxwell's brain injury was just a "gut feeling" on his part.
Dr. Robert Laureno, a neurologist, testified that the effects of hyponatremia vary greatly depending upon the patient and the *1384 rate that the sodium level falls. The main emphasis is to try and correct the condition as slowly as possible because if corrected too rapidly, brain damage can occur. Dr. Laureno testified that as a working rule, the sodium should be corrected no more than 12 milli-equivalents per liter, that is the level should not go up more than 12 points in 24 hours. At this rate, there would be no permanent injury from the hyponatremia or from the correction unless the patient happened to be very sensitive. Dr. Laureno had examined Mrs. Maxwell's records and concluded she had CPM as the result of the rapid rise in her sodium level. He stated that Mrs. Maxwell's sodium level of 96 had to be corrected but the correction was done too quickly. Dr. Laureno categorized the rate of increase in Mrs. Maxwell's sodium level by 26 units in a six hour period of time as extremely rapid and this type of rapid rise was consistent as the cause of CPM. He stated he did not observe any damage caused to her by the condition of hyponatremia alone and admitted there was some indication in the medical literature that hyponatremia could cause brain damage. As CPM was a permanent condition, he would not expect Mrs. Maxwell to improve.
Dr. Elliott Ross, a neurologist, testified he had examined Mrs. Maxwell in the spring of 1987 and mainly focused on the language behavioral problems she was having. Dr. Ross stated Mrs. Maxwell was an extremely difficult patient to examine because, although she could hear, she appeared to be unable to understand spoken language even though her understanding of the written word was quite intact. Dr. Ross wrote questions to Mrs. Maxwell and obtained his history in that fashion. Mrs. Maxwell had abnormal movements in her face and extremities although she was able to walk. She was very emotional with a fairly good memory and seemed to be cognizant of many of her problems. She also complained of auditory hallucinations. Dr. Ross stated the hyponatremia and the rapid correction of that condition were linked together in causing Mrs. Maxwell's problems. He believed she had sustained lesions in her brain stem as well as other brain damage. He believed that this damage was the result of the hyponatremia. Dr. Ross had observed Mrs. Maxwell for a number of years and stated her brain injuries would not get any better and the injuries could worsen with the normal aging process. Dr. Ross stated he had never seen a patient with a sodium level as low as Mrs. Maxwell's corrected without permanent damage and while medical literature suggested the brain damage occurred in the correction process, if the sodium was not corrected the patient would die.
Dr. Melvin Johnson, an internist, testified that he had treated Mrs. Maxwell in September, 1987 following her brain injury. Dr. Johnson stated Mrs. Maxwell was unable to understand spoken words or to speak but she could read and write. Dr. Johnson saw Mrs. Maxwell in January, 1989 at which time her condition had deteriorated. She would get agitated and pound her head and her handwriting had become almost illegible. Dr. Johnson was no longer able to communicate with Mrs. Maxwell by writing notes. She did not want to be around other people other than her sitter and family members and was physically aggressive, striking and scratching. Dr. Johnson testified that based on his observations, her condition seemed to be worsening and he would not expect it to improve. He estimated his future medical care of Mrs. Maxwell would be approximately $300 per year for general services.
Dr. Paul Ware, psychiatrist and neurologist, testified that he treated Mrs. Maxwell in consultation with Dr. Johnson. Mrs. Maxwell was having severe and significant problems in that she was very confused, not willing to eat and the family was unable to manage her. Dr. Ware was unable to perform an examination but instead had to observe Mrs. Maxwell because she was so agitated and belligerent. After reviewing the medical records and observing her, Dr. Ware stated there was no question that her difficulties were related to significant *1385 damage to several areas of her brain which was clearly permanent and irreversible. Dr. Ware opined that the care of Mrs. Maxwell during her hospitalizations in Springhill and at Willis-Knighton was responsible for her condition. He stated there was no question that Mrs. Maxwell had damage to the cortex or outer layer of the brain which is the main part of the brain that involves thinking, memory and speaking ability. She had almost no ability to express herself in spoken word and mumbled in garbled speech. She also showed a memory deficit and a lack of real appreciation of her surroundings and behavior. Mrs. Maxwell further had significant impairment of her impulse control. Dr. Ware believed Mrs. Maxwell had CPM but this did not cause the problems which stemmed from the damage in the cortex area of her brain. The generalized damage to the brain, which was the most debilitating disability suffered by Mrs. Maxwell, was probably caused by the drop in her sodium electrolytes. Dr. Ware stated it would be absolutely impossible for Mrs. Maxwell to care for herself and she would require constant care and medication in the future.
Dr. Marvin Soileau, a general practitioner, testified he was in the general practice of medicine in Springhill and had treated Mrs. Maxwell since 1963. Dr. Soileau stated that on March 1, 1985 Mrs. Maxwell was alert and walking by herself when she came into his office. She complained of being sick for several days with nausea, severe headache and neck pain in the cervical area. From Mrs. Maxwell's symptoms, Dr. Soileau thought she may have been developing meningitis and thought she should be admitted into the hospital. Dr. Soileau admitted Mrs. Maxwell with a diagnosis of cephalgia but his impression was early meningitis. He performed a spinal tap and ordered a CT scan, complete blood count, urinalysis and chest x-ray. Dr. Soileau stated Mrs. Maxwell continued to deteriorate in the hospital, becoming lethargic, drowsy and non-responsive. He stated Mrs. Maxwell had been taking hydropres on and off since 1973 and at her dosage it was a mild diuretic. He stated the D-5-W was administered rather than normal saline due to the suspected meningitis. Dr. Soileau stated when he examined Mrs. Maxwell she was fully hydrated and had no symptoms to indicate any type of electrolyte imbalance.
After examining the evidence, the jury found in favor of defendants. The interrogatories indicate that while the jury found from a preponderance of the evidence that Dr. Soileau failed to meet the standard of care for a general practitioner in the Springhill area in his medical treatment of Mrs. Maxwell, the jury did not find this failure was a proximate cause of her injuries.
Opinion of Medical Malpractice Panel
Plaintiff argues that the form of the decision of the medical malpractice review panel was improper as it went much farther than the statute allows and in fact addressed a legal conclusion concerning the cause of Mrs. Maxwell's injury. Plaintiff contends the introduction of this document into evidence was so prejudicial that it must be addressed even though plaintiff did not object to the introduction of this evidence at trial.
La.R.S. 40:1299.47(G) provides that the medical review panel shall render one or more of the following expert opinions:
(1) The evidence supports the conclusion that the defendant or defendants failed to comply with the appropriate standard of care as charged in the complaint.
(2) The evidence does not support the conclusion that the defendant or defendants failed to meet the applicable standard of care as charged in the complaint.
(3) That there is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court.
(4) Where paragraph (2) above is answered in the affirmative, that the conduct complained of was or was not a *1386 factor of the resultant damages. If such conduct was a factor, whether the plaintiff suffered: (a) any disability and the extent and duration of the disability, and (b) any permanent impairment and the percentage of the impairment.
La.R.S. 40:1299.47(H) provides in pertinent part that any report of the expert opinion reached by the medical review panel shall be admissible as evidence in any action subsequently brought by the claimant but such expert opinion shall not be conclusive and either party shall have the right to call any member of the medical review panel as a witness. The sole duty of the medical review panel is to express its expert opinion. No findings are made by the panel as to damages and the findings of the panel are not binding on the litigants. The panel simply renders an expert opinion and does not have the power to adjudicate the rights of any party. Derouen v. Kolb, 397 So.2d 791 (La.1981).
At the trial, plaintiff introduced the opinion of the medical review panel into evidence and now objects to its admission as prejudicial. It is well-settled that in the absence of an objection, the complaining party must be deemed to have waived his right to complain of the alleged impropriety on appeal. The reason is that, in the absence of an objection the trial court is afforded no opportunity to prevent or correct the alleged error. It is elementary that objections to evidence must be made at the time of its offer and the failure to do so, unless the opportunity did not exist, will be considered as a waiver of the objection. Calderon v. Johnson, 453 So.2d 615 (La. App. 1st Cir.1984) and Thibodeaux v. Western World Insurance Company, 391 So.2d 24 (La.App. 3d Cir.1980). Thus, plaintiff's failure to object to the admission of this evidence at trial would preclude his assertion that this evidence was improper as to form and prejudicial. In any event, all of the physicians who composed the panel were present at trial and subject to full examination by the parties so that the opinions of these physicians regarding causation would have been presented to the jury regardless of the content of the panel opinion. Therefore, any alleged error as to the form of the panel opinion was harmless.
Malpractice of Soileau
On appeal, plaintiff contends that the verdict of the jury was clearly contrary to the law and evidence. After reviewing the record, particularly the medical evidence, we agree.
La.R.S. 9:2794 provides in pertinent part that in a malpractice action plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances;
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
An unsuccessful course of treatment is not per se an indication of malpractice. The doctor's conduct is evaluated in terms of reasonableness under the circumstances existing when his professional judgment is exercised. Neither a general practitioner nor a specialist is held to a standard of perfection or evaluated with the benefit of hindsight. A general physician is not required to exercise the highest degree of care possible. His duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. In a medical malpractice action, the opinions of expert witnesses who are members of the medical profession and who are qualified to testify on the subject are necessary to determine whether *1387 or not the physician possessed the requisite degree of knowledge or skill, or failed to exercise reasonable care and diligence. The views and opinions of the expert witnesses, though not controlling, are very persuasive in this regard. Pitre v. Opelousas General Hospital, 530 So.2d 1151 (La. 1988); Ogletree v. Willis-Knighton Memorial Hospital, 530 So.2d 1175 (La.App. 2d Cir.1988), writ denied, 532 So.2d 133 (La. 1988); Douzart v. Jones, 528 So.2d 602 (La.App. 2d Cir.1988); Jackson v. Huang, 514 So.2d 727 (La.App. 2d Cir.1987), writ denied, 518 So.2d 1050 (La.1988) and 519 So.2d 119 (La.1988); Coleman v. Touro Infirmary of New Orleans, 506 So.2d 571 (La.App. 4th Cir.1987), writ denied, 507 So.2d 1247 (La.1987) and 507 So.2d 1248 (La.1987), and Frasier v. Department of Health and Human Resources, 500 So.2d 858 (La.App. 1st Cir.1986).
In a medical malpractice action, the plaintiff must show that as a result of the defendant's negligence he suffered injuries that would not otherwise have occurred. Plaintiff need not show that defendant's conduct was the only cause of the harm nor must he negate all other possibilities. Rather, he must show by a preponderance of the evidence, or more probably than not, that he suffered the injury because of defendant's conduct. Where different medical procedures or different health care providers may have concurred to create or worsen the harm, a tortfeasor is responsible not only for the injuries directly resulting from his substandard conduct but for subsequent treatment by health care providers who seek to resolve the original harm. This is so whether or not the subsequent treatment is rendered negligently. However, if the subsequent treatment is deemed negligent, then the original physician and the subsequent ones are solidarily liable for the total harm. Thus, the risk of further injury from treatment of health care providers whose services are made necessary by the original negligent act is within the scope of the risk foreseeable by the original tortfeasor. Weber v. Charity Hospital of Louisiana, 475 So.2d 1047 (La.1985), and Howell v. Iacona, 505 So.2d 821 (La.App. 2d Cir. 1987).
It is well-settled that jury verdicts are to be accorded great respect and should not be disturbed unless clearly wrong. It is the province of the trier-of-fact when there are conflicts in testimony to render reasonable evaluations of credibility and to draw reasonable inferences from the facts. These determinations should not be disturbed upon review, even though the appellate court may feel its own evaluations and inferences are as reasonable. In medical malpractice actions, a reviewing court will give great deference to a jury's findings when medical experts express different views, judgments and opinions on whether the standard of care was met in any given case. Rosell v. Esco, 549 So.2d 840 (La. 1989); Miller v. Winn-Dixie Stores, Inc., 527 So.2d 989 (La.App. 3d Cir.1988), writ denied, 531 So.2d 763 (La.1988); Butts v. Cummings, 488 So.2d 1169 (La.App. 2d Cir.1986), writ denied, 494 So.2d 327 (La. 1986), and Doss v. Hartford Fire Insurance Company, 448 So.2d 813 (La.App. 2d Cir.1984), writ denied, 450 So.2d 359 (La. 1984).
While the jury found from a preponderance of the evidence that Dr. Soileau failed to meet the standard of care for a general practitioner in the Springhill area in his medical treatment of Mrs. Maxwell, the jury did not find that this failure was the proximate cause of the injuries sustained by her. Based upon the legal principles set forth in Howell v. Iacona, supra, we find that this verdict was clearly wrong.
The evidence at trial established that when Mrs. Maxwell was admitted into the hospital she was an active, healthy woman. At the time of her admission she was alert and able to walk and talk. Upon her admission, Mrs. Maxwell was administered D-5-W fluid and hydropres and Dr. Soileau never performed an electrolyte test during her hospitalization despite the continuation *1388 of her symptoms and the worsening of her condition. The medical testimony established that Mrs. Maxwell may have been suffering from hyponatremia upon her admission to the hospital. However, it is clear that her sodium level was not at a life-threatening level at this period of time since she did not display any of the symptoms, such as confusion. Had Mrs. Maxwell had a sodium level of 96 upon her admission at Springhill, the testimony established she would have most probably not survived five days of treatment with the D-5-W and no saline containing fluids. The evidence established that in all probability Mrs. Maxwell's condition actually worsened during her hospitalization due to the course of treatment undertaken by Dr. Soileau. The administration of the D-5-W and hydropres in light of her symptoms was inappropriate without the periodic assessments of serum electrolytes. The medical testimony established that Mrs. Maxwell's serum sodium levels were significantly lowered by the treatment administered by Dr. Soileau until it reached the quite dangerous life-threatening level of 96. The evidence established that this serum sodium level was rarely seen in patients who survived and placed Mrs. Maxwell in critical condition. After Mrs. Maxwell was admitted into Willis-Knighton and her dangerous sodium level was detected, Dr. Cooper was required to undertake a rapid correction.
The testimony at trial as to the cause of Mrs. Maxwell's severe and irreversible brain damage was conflicting. The expert medical witnesses were divided as to whether the brain damage was caused by the hyponatremia itself, the rapid correction of this condition or a combination of both factors. There was testimony that the medical literature had indicated the low serum sodium level could cause diffuse brain injury. However, Dr. Laureno testified there would be no permanent injury from the hyponatremia and the rapid correction of this condition actually caused the brain damage. Dr. Ware testified that the rapid correction most probably resulted in the CPM but the most debilitating brain damage sustained by Mrs. Maxwell was probably caused by the drop in her sodium electrolytes. The experts did agree that Mrs. Maxwell's sodium level of 96 was life-threatening and necessitated an emergency correction. If the deficiency had not been corrected Mrs. Maxwell would have probably gone into convulsions and may have died.
The record clearly supports the jury's finding that Dr. Soileau's conduct fell below the required standard of care for general practitioners. As noted above, the periodic assessment of Mrs. Maxwell's electrolytes was crucial considering her symptoms and Dr. Soileau's course of treatment during her hospitalization. The record further supports the conclusion that the negligence of Dr. Soileau placed Mrs. Maxwell in a position of extreme peril and it was that peril or the treatment necessary to correct this condition which ultimately resulted in the debilitating brain injury. Although there is some dispute as to whether the brain injury was actually caused by the abnormally low level of electrolytes created by Dr. Soileau's conduct or the rapid correction thereof undertaken by Dr. Cooper, the resolution of that issue is of no legal significance in this case. Mrs. Maxwell was placed in jeopardy by the conduct of Dr. Soileau and he is legally responsible for all of the natural and foreseeable consequences of his acts. The risk of further injury by other health care providers whose services were made necessary by the original negligent act of Dr. Soileau was a foreseeable consequence of his negligence, particularly considering the life-threatening situation in which Mrs. Maxwell was placed necessitating immediate corrective measures as opposed to a slow, deliberate and perhaps better planned course of treatment. The fact that Mrs. Maxwell's injuries may have been caused by the rapid elevation of her serum sodium level as opposed to the lowering of that level does not act to act to insulate Dr. Soileau from liability for her injuries.
Jury Instructions
As we have concluded that the jury verdict was erroneous as a matter of law, a *1389 complete review of the jury instructions is unnecessary. However, we note the jury may have been confused by the instructions by the trial court on the issue of proximate cause. The record shows that after a period of deliberations the jury returned to the courtroom and requested the jury charges be read again and further requested a definition of the term "proximate cause". The trial court read to the jury the definition of that term appearing in Black's Law Dictionary.
While the definition of "proximate cause" may have been technically correct, it should have been followed by the trial court with an additional instruction on the rule of law set forth in Howell v. Iacona, supra, even though this principle was included in the original jury instructions. The definition read to the jury could have led the jury to erroneously conclude that immediate causation of the injury was necessary in order to find liability. The rule of law set forth in Howell v. Iacona, supra, recognizes that immediate causation is not necessary as long as the injury is a foreseeable result of the original negligent treatment. The failure to re-emphasize this instruction in connection with the explanation of "proximate cause" could have very easily confused the jury and caused the erroneous verdict.
Damages
Although the trial court did not award damages to plaintiff, this court is empowered to award them since the record is complete and contains sufficient proof on this issue. Howell v. Iacona, supra and Jones v. P.K. Smith Chevrolet-Olds, Inc., 444 So.2d 1372 (La.App. 2d Cir.1984).
The evidence established that Mrs. Maxwell was in good health and an active participant in her church and community. She enjoyed many activities and especially enjoyed being with her grandchildren. She had been the owner of a flower and gift shop, recently sold before her illness, and was looking forward to retirement and future travel.
As a result of her injury, Mrs. Maxwell lost her ability to communicate verbally and would communicate by writing notes. She cannot perform such routine tasks as bathing or dressing herself, preparing food, brushing her teeth or making phone calls. Mrs. Maxwell requires full time care and is attended by her husband and a part-time attendant. She is able to read but her ability to communicate by notes has deteriorated since her writing has become more difficult to read. Mrs. Maxwell gets violent on occasion and has kicked or struck family members and her attendant. She gets extremely upset upon being touched by others outside the family which makes it difficult to obtain medical evaluations and also appears to suffer from hallucinations. Mrs. Maxwell is aware of her condition and has communicated that she wants control of her life. Her only activities at present consist of reading and watching closed-captioned television on occasion.
Considering the severity of the irreversible injuries suffered by Mrs. Maxwell and the devastating effect of those injuries upon her, we find an award of $500,000, exclusive of future medical costs, is appropriate.
La.R.S. 40:1299.43 requires the trier-of-fact to determine if the patient is in need of future medical care and related benefits and if so, the amount thereof. In accordance with Subsection B(1) of that statute, custodial services are to be included with future medical care. It is well-settled that an award for future medical expenses is in great measure highly speculative and not susceptible of calculation with mathematical certainty. However, like any other element of damages, future medical expenses must be established with some degree of certainty. An award will not be made for future medical expenses which may or may not occur in the absence of medical testimony that they are indicated and setting out their probable costs. Where an exact estimate of damages cannot be made but there is a right to recovery, the trial court has the discretion to *1390 assess damages according to the facts and circumstances of the case. Hunt v. Board of Supervisors of Louisiana State University, 522 So.2d 1144 (La.App. 2d Cir.1988) and Bonner v. Watkins Motor Lines, Inc., 494 So.2d 1363 (La.App. 2d Cir.1986).
The testimony at trial clearly established that Maxwell would be in need of future medical treatment and medication as well as full-time care.
Dr. Charles Bettinger, an economist and statistician, testified Mrs. Maxwell had a future life expectancy of 20.8 years and Mr. Maxwell had a future life expectancy of 14.2 years. Using Mrs. Maxwell's estimated life expectancy, Dr. Bettinger estimated the cost of nursing home care would be approximately $337,025. He also calculated the cost of Mrs. Maxwell's care provided she was cared for in her home by her husband and some outside assistance for the next 14.2 years using the cost of the attendant at $110 per week. The cost of this care was calculated at $99,599 and did not assign any value to the services rendered by Mr. Maxwell. After Mr. Maxwell's death, Mrs. Maxwell would require some form of institutional care for the remainder of her life, which cost was estimated to be $67,682.
Based upon Dr. Bettinger's testimony we find that Mrs. Maxwell will need future custodial care or assistance in the amount of $167,281. It appears that plaintiff is willing and able to care for his wife at home with the assistance of a paid attendant and for that reason we have rejected the higher calculation presented by Dr. Bettinger for lifetime nursing home care. However, as the in-home attendant is being provided in lieu of nursing home care, we find that such an attendant should be considered "custodial care" as provided for in the statute. The evidence further established that Mrs. Maxwell would require future medication with an estimated lifetime cost in the amount of $16,859, based upon a monthly cost of $75, and future basic medical care in the amount of approximately $300 per year with an estimated lifetime cost of $5,619. These calculations are fully supported by the record.
Additionally, it is well-established that the term "future medical care and related benefits" includes not only those expenses incurred after the date of trial but also those medical expenses incurred after the date of injury but before the date of trial. La.R.S. 40:1299.39 and 40:1299.43. See also Sibley v. Board of Supervisors of Louisiana State University, 477 So.2d 1094 (La.1985), on remand, 490 So.2d 307 (La.App. 1st Cir.1986), writ denied, 496 So.2d 325 (La.1986); Bourgeois v. Ochsner Foundation Hospital, 550 So.2d 1229 (La. App. 5th Cir.1989), and Lamark v. NME Hospitals, Inc., 522 So.2d 634 (La.App. 4th Cir.1988), writ denied, 526 So.2d 803 (La. 1988). Therefore, under appropriate circumstances the court may award $500,000 plus all medical expenses incurred from the date of the malpractice without exceeding the limit of recovery set forth in La.R.S. 40:1299.42.
The evidence presented at trial established that from the date of injury through the date of trial Mrs. Maxwell incurred medical expenses totaling $73,258.82. We conclude that this amount should be awarded in addition to the $500,000 and the other future medical expenses as set forth hereinabove.
Interest
Pursuant to La.R.S. 40:1299.42B(1) plaintiff is entitled to recover judicial interest on the $500,000 award. In accordance with La.R.S. 40:1299.47(M) that interest shall accrue from the date that plaintiff filed the complaint with the Commissioner of Insurance. Plaintiff is also entitled to recover judicial interest on the medical expenses incurred from the date of injury to the date of trial. Judicial interest on these amounts should accrue from the date the complaint was filed with the Commissioner of Insurance or the date they were incurred, whichever is later. Lamark v. NME Hospitals, Inc., supra. Judicial interest would not run on the future medical *1391 expenses incurred after the date of trial until the date those expenses are incurred and presented to the Patient Compensation Fund for payment pursuant to La.R.S. 40:1299.43.
Decree
For the reasons set forth herein, the judgment of the trial court is REVERSED and there is judgment in favor of plaintiff and against the defendants as follows:
1) In the amount of $500,000, with judicial interest from the date of filing the complaint with the Commissioner of Insurance;
2) In the amount of $73,258.82 representing medical expenses incurred from the date of the malpractice, with judicial interest from the date those expenses were incurred or the date the complaint was filed with the Commissioner of Insurance, whichever is later;
3) In the amount of $189,759 representing future medical expenses, with judicial interest as set forth above; and,
4) For all court costs, both in the lower court and on appeal.
Defendants, in solido, are not personally liable for an amount in excess of $100,000, in accordance with La.R.S. 40:1299.42B(2).

ON APPLICATION FOR REHEARING
Before HALL, FRED W. JONES, Jr., HIGHTOWER, NORRIS and LINDSAY, JJ.
Rehearing denied.