621 So.2d 1192 (1993)
Gloria EDENFIELD and Walter Robert Edenfield, Plaintiffs-Appellants,
v.
Dr. Dara VAHID, Defendant-Appellee.
No. 92-678.
Court of Appeal of Louisiana, Third Circuit.
June 30, 1993.
Rehearing Denied August 24, 1993.
*1193 James P. Ryan, Opelousas, for Gloria Edenfield, etc.
Howard B. Gist Jr., Alexandria, for Dr. Dara Vahid.
Before GUIDRY, LABORDE, KNOLL and WOODARD, JJ., and CULPEPPER, J. Pro Tem.[*]
KNOLL, Judge.
Gloria and Walter Edenfield appeal the judgment of the trial court which dismissed their medical malpractice claim against Dr. Dara Vahid. They argue that the trial court was manifestly erroneous in its conclusions that Dr. Vahid's use of a Prolene suture in an anal fistulectomy did not fall below the applicable standard of care and further that the use of this suture was not *1194 the cause of Mrs. Edenfield's complaints.[1] We reverse and render.

FACTS
In May 1989, Gloria Edenfield, a nurse's aide at Humana Hospital in Oakdale, consulted Dr. Dara Vahid, a surgeon on the hospital staff, concerning a long standing rectal problem. Dr. Vahid examined Mrs. Edenfield in the hospital emergency room and diagnosed her problem as an anal fistula, an abnormal tubelike passage from the anus to a free surface or to another cavity, a problem which can only be cured surgically. Mrs. Edenfield was eager to have the problem resolved, because it had persisted for some time. Surgery was scheduled for June 1, 1989. There are two accepted surgical procedures for treatment of an anal fistula: a fistulectomy, wherein the fistula is surgically excised from the area; and, a fistulotomy in which the fistula is surgically opened, the area cleaned and the tissue left to heal. Dr. Vahid elected to perform a fistulectomy.
After Dr. Vahid's surgery on June 1, 1989, Mrs. Edenfield continued to have rectal problems and, on September 20, 1989, consulted another surgeon, Dr. Philip Lindsay. Mrs. Edenfield complained of rectal pain, frequent drainage with sudden gushes of mucoid and fecal material and occasional small amounts of blood every two to three days. Dr. Lindsay's examination found no evidence of sphincter malfunction but, because of her symptoms and Dr. Vahid's surgery notes which showed involvement of the sphincter muscles, Dr. Lindsay referred Mrs. Edenfield to Dr. Alan E. Timmcke at Ochsner Clinic in New Orleans for an anal manometry, a test which measures sphincter function. Based upon Dr. Timmcke's report, elaborated upon infra, and his observations, Dr. Lindsay suspected that Mrs. Edenfield had a chronic inflammation and a low grade infection. He explained that the only way to clear up the problem was to repeat the surgery. On October 19, 1989, Dr. Lindsay performed a fistulotomy on Mrs. Edenfield. His surgical notes state, in pertinent part:
"FINDINGS: With the patient in the lithotomy position, there was a scar in the 5 o'clock position from a previous anal fistulectomy. There was a punctate opening that communicated from the perianal skin to the anorectal junction below the internal sphincter. There was another opening that went from the second opening through the internal sphincter and into the rectal mucosa. The internal sphincter was scarred underneath the fistula area, and it was intact. There was a Prolene suture, or at least a monofilament suture that appeared to be Prolene, within the external fistula.
* * * * * *
The fistula was probed from externally and the skin incised over it, which opened it and exposed a monofilament suture. The suture was removed easily without cutting any tissue. Then the upper portion of the fistula was traced and the mucosa incised, leaving the internal sphincter intact. Granulation tissue was carefully removed, and then the mucosa was closed with running locking 2-0 chromic over the internal sphincter, leaving the anorectal junction tissue and the perianal skin in the area of the fistulotomy open. Zeroform anal wick was placed. A dressing was applied. The patient was awakened by Anesthesia and taken to Recovery, stable, having tolerated the procedure well."
The Prolene suture Dr. Lindsay removed was the one Dr. Vahid used during the June 1, 1989, operation to suture and support fibers of the sphincter. It was Dr. Vahid's use of this single Prolene suture which forms the basis of this litigation.

MANIFEST ERROR: PRELIMINARY DISCUSSION
Initially, the Edenfields assert that when the trial court's conclusions are based on deposition evidence, the manifest error *1195 standard of review is not applicable. We disagree.
In Allen v. Louisiana-Pacific Corporation, 512 So.2d 556, 558 (La.App. 3rd Cir. 1987), we stated:
"In the past this court recognized that the manifest error test is inapplicable on appellate review where the question is one of sufficiency and preponderance of medical testimony in the form of depositions because the trial judge did not observe the demeanor of the witness and, therefore, is in no better position to assess credibility than the appellate court. However, our Supreme Court in a recent decision, Larry Joe Virgil v. American Guaranty and Liability Insurance Company, et al., 507 So.2d 825 (La.1987) re-emphasized the manifest error standard and its purpose enunciated in Canter v. Koehring Co., 283 So.2d 716 (La. 1973), and held: `The court of appeal erred in holding that the manifest error standard of appellate review does not apply when the evidence before the trier of fact consists solely of written reports, records and depositions. The court further erred in assessing credibility and weighing medical evidence as if the court of appeal were the trier of fact.' Therefore, we henceforth apply the manifest error standard to any evidence relied upon by the trier of fact." (Citations omitted.)
Accordingly, in the case sub judice, it is clear that even though much of the medical evidence admitted into evidence was depositional, we are nonetheless bound by the manifest error standard in our review of the trial court's judgment.

MANIFEST ERROR: MEDICAL MALPRACTICE
As stated earlier, the Edenfields contend that the trial court was manifestly erroneous in its conclusion that they failed to prove by a preponderance of the evidence that Dr. Vahid's use of the Prolene suture in anorectal surgery was below the applicable standard of care and that the Prolene suture was the cause of her post-operative development of incontinence and infection, as well as the development of a second anal fistula.
A plaintiff's burden of proof in a medical malpractice suit is set forth in LSA-R.S. 9:2794 which states, in pertinent part:
"A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians,... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred."
Section C of the statute states that the plaintiff must prove the physician's negligence by a preponderance of the evidence and that injury alone does not raise a presumption of the physician's negligence. Furthermore, it is well recognized that an unsuccessful course of treatment is not per se an indication of malpractice. See, Chaney v. State Through Dept. of Health, 432 So.2d 256 (La.1983).
After hearing testimony and reviewing the depositional evidence, the trial court issued written reasons for judgment. In pertinent part, the trial court reached the following conclusions:
"This court does not feel that plaintiff has met the burden of proof required by *1196 R.S. 9:2794 to prove malpractice because Dr. Vahid chose to use the prolene suture rather than a different type ... Perhaps the strongest defense presented by Dr. Vahid was the failure of the plaintiff to prove that the suture was the cause or the sole cause of Mrs. Edenfield's complaints ... Defendant as well as plaintiff's medical experts established there were other plausible explanations for the patient's post operative complaints. Recurrence of a fistula is a known risk and a distinct possibility with this type of surgery even in the best of hands. Dr. Timmebe [sic] the consulting proctologist at Oschner's [sic] Clinic stated in his letters to Dr. Linsey [sic] that any type stitch could cause this irritation after surgery and further he found evidence of a neuroplaxia condition that could have been the cause of plaintiff's complaints and symptoms.
Plaintiff's main complaint was incontinent [sic] and that this was caused by the prolene stitch. Dr. Hovnatanian one of the experts for plaintiff stated there was no reasonable explanation for continuing incontinence absent proof that Dr. Vahid seriously injured the sphincter muscles during his surgery. There is no proof that he did."
LSA-R.S. 40:1299.47 provides that even though the opinion of the medical review panel is admissible into evidence, it is not conclusive. Mrs. Edenfield's claim of medical malpractice was submitted to a medical review panel of three surgeons, Drs. G.L. Hovnatanian, Edward Villemez, and Daniel Buller, who issued the following opinion:
"1. The evidence supports the conclusion that the defendant, Dr. Dara Vahid failed to meet the applicable standard of care as charged in the complaint as to the use of non-absorbable suture material.
2. We are unable to determine, from the evidence submitted for review of the panel, as to whether or not the use of non-absorbable suture material was the sole cause of the damages suffered by Gloria Edenfield."
At trial all three medical review panelists testified by deposition. We will separately address the two paragraphs of the medical review panel.
All of the members of the medical review panel opined that Prolene was inappropriate in the anorectal area because of the enhanced probability for bacterial infection in the area and the fact that the presence of any "foreign body" could aggravate the infection. Dr. Buller stated that use of the Prolene suture in the anal area was "... just a poor choice in an area of infection... it's unconventional" in that the non-absorbable suture can act as a foreign body and become the situs of infection. He also stated that he could find nothing wrong with Dr. Vahid's techniques, that the decision to suture or not was a matter of professional judgment and that where "... the external sphincter muscle had been divided, then I think certainly, it should be sutured." When asked his opinion of Dr. Timmcke's report, he opined. "... I really couldn't conclude a hell of a lot from it. He seemed to be walking a line, and it was inconclusive in my opinion".
Dr. Hovnatanian stated that, in his opinion and experience, a non-absorbable suture should not be used in the rectal area as it acts as a foreign body and delays healing. Dr. Hovnatanian further stated that generally surgery is a matter of trendsnational, regional, and/or local, and that the way trends change is through some "mavericks" trying different techniques. He continued:
"Unless this something different is so dramatic that would result in loss of life or limb, then I would say more power to him, somebody has got to try something different and show us that there are other ways of doing things ... [I]f somebody has done something different than most of us know, ... for heaven's sake, I don't consider that a crime. Well, the result wasn't ideal, but to consider that a malpractice, no."
Dr. Villemez, the third member of the medical review panel, was the most critical of Dr. Vahid's use of Prolene. He stated:

*1197 "It is just something that I have never heard, read or seen used in that particular location, or anywhere in the alimentary tract from the mouth to the rectum. I think that [Prolene] is an inappropriate suture material to use in that instance... It seems to me that that single suture really was the cause of all her problems, and removing that I think largely alleviated her problems."[2]
Dr. Phillip C. Lindsay was the second surgeon Mrs. Edenfield consulted for her anal problem. He first examined her on September 20, 1989, at which time she gave him a history of a fistulectomy performed by Dr. Vahid on June 1, 1989, followed by frequent anorectal drainage. She described this drainage as a "sudden gush" every two to three days of a mucoid substance containing small amounts of fecal material with an occasional small amount of blood. Dr. Lindsay's examination revealed scarring on the left side of the rectal area at approximately the 5:00 position with what appeared to be a punctate opening in the scar. No drainage was present at the time and a complete anorectal examination was not possible because of plaintiff's complaints of pain. Dr. Lindsay noted that Mrs. Edenfield appeared to have normal sphincter tone, but suggested that she undergo an anal manometry with Dr. Timmcke at Ochsner Clinic in New Orleans.
On October 11, 1989, Dr. Timmcke administered the anal manometry procedure and sent the following letter to Dr. Lindsay:
"I have enclosed a copy of the anal manometry report for your patient, Gloria Edenfield. As per our phone conversation, you will note the report indicates complete absence of a squeeze pressure increase with voluntary external sphincter contraction. This condition is not likely the result of a unilateral external anal sphincter injury or unilateral pudendal nerve injury, and most likely represents a pre-existing condition that was exacerbated by the fistula surgery. The rectal sensation is normal, and the rectoanal inhibitory reflect is normal, as is the anal sphincter length. The sphincter is symmetrical in all four quadrants, and the resting pressure is well above the lower limit of normal, which is 40 mm. of mercury.
The continued seepage Mrs. Edenfield may be experiencing could be due to a persistent foreign body in the remaining wound. Although she was too uncomfortable for a very thorough anal examination, she appeared to have an unhealing intra-anal portion of the wound. Perhaps an examination under anesthesia would better reveal the reason for her failure to heal...."
Dr. Lindsay recommended she undergo the procedure that Dr. Timmcke suggested. On October 19, 1989, Mrs. Edenfield underwent a fistulotomy performed by Dr. Lindsay. The post-operative report of Dr. Lindsay, quoted supra, indicates that he found a fistula which was superficial externally (it did not go into the muscle) and a prolene suture beneath the skin just above the internal sphincter in the fistulous tract. The area around the suture was very inflamed, and there was fibrotic or scar tissue about the area of the suture. He further stated that he removed the prolene suture and then "... cleaned up granulation tissue a bit ..." before completing the fistulotomy. Dr. Lindsay opined that Mrs. Edenfield's problem "... would not nearly have been as great had absorbable sutures been used."
Dr. Bernard Kaplan, the partner of Dr. Lindsay, also testified. Dr. Kaplan was the only physician besides Dr. Vahid who preferred fistulectomies to correct anal fistulas. He stated that in fistulectomies he preferred to use long term absorbable sutures, but had used non-absorbable sutures *1198 "... particularly in repairing a muscle or that sort of thing, in this area. So I've actually used both ... [W]hen you wanted a permanent suture, it would not be unusual to use Prolene because of its lack of reactivity to the tissue."
Dr. Kaplan also stated that fistulas commonly recur, even with the best of surgical care, and fistula development is more probable in a person who has a history of a previous problem.
Dr. Vahid testified that when he performed Mrs. Edenfield's fistulectomy on June 1, 1989, the fistula he excised went through the deep layers of the sphincter; to remove the fistula, it was necessary for him to divide the fibers of the sphincter. He stated that after the fistula tract and necrotic material were excised, he used 2-0 chromic sutures to reapproximate the sphincter fibers. Because of Mrs. Edenfield's size, 5'3" tall and 250 pounds in weight, he decided to use one single Prolene suture to support the sphincter.
Dr. Vahid entered into evidence several articles from the British Journal of Surgery, documenting the use of prolene sutures in sphincter repair; an article Dr. J.C. Goligher wrote in his text Surgery of the Anus, Rectum and Colon, documenting the use of non-absorbable sutures in fistula excisions; and a letter from Dr. Marvin Corman, a recognized expert in the field of anorectal surgery. Dr. Corman's letter stated:
"I am writing concerning the Edenfield vs. Vahid action. Pursuant to our conversation I am providing this brief report concerning my opinion of Dr. Vahid's procedure.
Basically, with respect to the major allegation, that of using a nonabsorbable suture in the repair of a sphincter, I would like to offer this thought. It is generally considered today that one should use a long-term absorbable suture when one performs an anal sphincter repair either primarily for anal incontinence or concomitant with the performance of an anal fistula operation. That said, it is my opinion that the use of the non-absorbable suture in no way affected the subsequent results. In other words, the patient's disability (such as it is) would have been the same irrespective of the choice of suture material. Transsphincteric fistulas always are associated with some degree of impairment for bowel control irrespective of the method of treatment. Certainly, an attempt to do a primary repair with the fistula was more than a contemporary approachit was quite appropriate. In fact, it probably did not fail. It merely presented a slight problem in that a foreign body had to be removed, and then the wound healed without incident." (Emphasis added.)
Initially, the trial court dismissed the Edenfields' demands, concluding that Dr. Vahid was not guilty of medical malpractice because he chose to use a Prolene suture in an anal fistula operation. After carefully reviewing the medical evidence presented, we find that the trial court erred in this conclusion. Clearly, the medical evidence preponderates that the use of a Prolene suture rather than a long term absorbable suture, under the circumstances, fell below the applicable standard of care.
The trial court further held that the evidence was not sufficient to establish that Dr. Vahid's use of the Prolene suture was the cause of Mrs. Edenfield's continued complaints.
In Austin v. St. Charles General Hosp., 587 So.2d 742 (La.App. 4th Cir.1991), writ denied, 590 So.2d 80 (La.1991), the court, quoting in part from Maxwell v. Soileau, 561 So.2d 1378 (La.App. 2nd Cir.1990), writ denied, 567 So.2d 1123 (La.1990), stated at page 748:
"`In a medical malpractice action, the plaintiff must show that as a result of the defendant's negligence he suffered injuries that would not otherwise have occurred. Plaintiff need not show that defendant's conduct was the only cause of the harm nor must he negate all other possibilities. Rather, he must show by a preponderance of the evidence, or more *1199 probably than not, that he suffered the injury because of defendant's conduct.'
* * * * * *
Causation is a question of fact. Smith v. State Through Dept. of Health Human Resources Admin., ... [523 So.2d 815 (La.1988) ]. The test for determining the causal relationship between the accident and subsequent injuries is whether the plaintiff proved through medical testimony that it was more probable than not that subsequent injuries were caused by trauma suffered in the accident."
Although the medical review panel agreed that Dr. Vahid failed to meet the applicable standard of care as charged in Mrs. Edenfield's complaint as to the use of the non-absorbable suture, it candidly stated:
"We are unable to determine, from the evidence submitted for review of the panel, as to whether or not the use of non-absorbable suture material was the sole cause of the damages suffered by Gloria Edenfield." (Emphasis added.)
Contrary to the trial court's statement in its written reasons for judgment that the medical review panel had difficulty with causation, we find that the panel could not state that the suture was the only cause of Mrs. Edenfield's problems post-surgery. Nevertheless, the panel's statement clearly indicates that they found that the suture placed by Dr. Vahid was at least a cause of Mrs. Edenfield's problems.
Commenting on Mrs. Edenfield's condition after Dr. Vahid's initial surgery, Dr. Lindsay, Mrs. Edenfield's second surgeon who removed Dr. Vahid's suture, stated:
"Q. In the same report you stated, and I quote, `I would say that it's very likely that the magnitude of the problem would not nearly have been as great had absorbable sutures been used. The patient has had chronic irritation present which is why she is not healed.' Is that also a fair summary of your opinion in this case?
A. Yes, sir.
* * * * * *
Q. Doctor, you've told us that irritation in that area of the body can cause incontinence or loss of ability to control your bowels when we first started talking to you. Is that a fair statement?
A. Because it irritates the muscle.
Q. And you've told us that in this woman that you felt that the presence of the Prolene suture was irritating her in that area of her bowel?
A. Yes, sir.
Q. Is that also a fair statement?
A. Yes, sir.
Q. Following the removal of this Prolene suture, she had a drastic improvement in her ability to control her bowels, is that correct?
A. She did improve.
Q. Assuming those facts to be true, what role do you think that the presence of the Prolene suture had in causing her her incontinence?
A. Well, I think it just had a chronic irritation and kept the sphincter irritated and kept it from functioning as it should have. Though it was not completely dysfunctional as the manometry report shows, but there was a chronic irritation that kept the muscle from functioning.
Q. And after that removal, that chronic irritation eventually improved and as expected...
A. It did improve but it did not become totally normal."
Dr. Villemez, another one of the medical review panelists, stated:
"Q. Dr. Lindsay testified that he felt that the proline [sic] suture that he found was causing irritation to the surrounding tissue and was preventing the area from closing. Do you agree or disagree with that testimony?
A. I agree with that.
Q. Dr. Lindsay further stated that he felt that the presence of the suture kept the fistula open and that he believes that due to the fact that the area healed and closed after his surgery led him to believe that the suture was causing this woman problems?

*1200 A. I agree with that.
Q. All right. Why?
A. Because it is a non-absorbable suture. It acts as a foreign body, and it was a source of continuing infection, and I think the fact that she apparently improved for the most part after removing that speaks for itself.
* * * * * *
Q. Dr. Lindsay also expressed the opinion that the surgery which he performed on October 19th, 1989 was made necessary because of the presence of the proline [sic] suture which was keeping the area open. Do you agree with this?
A. Yes, sir.
* * * * * *
Q. Doctor, what ... is your opinion regarding what role this suture caused ... in bringing about this woman's bowel control problems following this surgery [by Dr. Vahid] in light of the fact that it developed following the surgery and in light of the fact that these symptoms improved following removal of the suture?
A. It seems to me that that single suture really was the cause of all of her problems, and removing that I think largely alleviated her problems."
Dr. Buller, also a member of the medical review panel, agreed with Dr. Lindsay's opinion that the presence of the Prolene suture was a factor of continuing the infection and contributed to the pain Mrs. Edenfield experienced. Furthermore, with reference to Mrs. Edenfield's lessened bowel control following Dr. Vahid's surgery, Dr. Buller stated:
"I don't think the suture in itself caused or prevented incontinence except in the context of preventing infection from being corrected. The more infection that persisted and the more extensive the infection, it could have an effect on continence."
Finally, Dr. Hovnatanian, the other medical review panelist, was questioned as follows:
"Q. ... Are you aware of the testimony of Doctor Lindsay that he felt that the presence of the suture kept the fistula open and that ... he believes that due to the fact that the area did heal and close following the removal of the prolene suture, that it was the suture that was preventing the area from ... closing up; are you familiar with that testimony?
A. Yes, sir. And I certainly would agree with that. I think removal of the foreign body would certainly result in completion of the healing process.
* * * * * *
Q. Doctor Lindsay also expressed the opinion that the surgery that he performed on October 19th of 1989 was made necessary because of the presence of the prolene suture which was keeping the area open. Do you agree with that?
A. Yes, sir.
Q. Doctor Lindsay stated ... `It's very likely that the magnitude of the problem would not nearly have been as great had absorbable sutures been used. The patient has had a chronic irritation present, which is why she has not healed, ...' Do you agree with that?
A. I agree with that.
Q. Ms. Edenfield's pain in the operative site eventually went away following the removal of the Prolene suture by Doctor Lindsay on October 19th, 1989. What does her improvement following ... the removal of that suture tell you about the role of the suture in causing all or part of her pain?
A. Well, again, the presence of foreign material in a contaminated area would delay healing. Delayed healing would certainly prolong the period of pain and discomfort associated with whatever trauma that was in the area, consequently, the period of time and the period of pain and discomfort would be prolonged. That much of it is, I think, self-explanatory."
After carefully reviewing the record, we find that the trial court erred in finding that the Edenfields failed to prove by a preponderance of medical testimony that it *1201 was more probable than not that her subsequent injuries were caused by Dr. Vahid's improper use of the non-absorbable Prolene suture. Accordingly, we would further find that the trial court's contrary finding was manifestly erroneous. Therefore, we reverse the trial court judgment and award damages to Mrs. Edenfield as a result of Dr. Vahid's medical malpractice, and award her husband damages for loss of consortium.

DAMAGES
The Edenfields sought special damages for medical expenses and loss of earnings, general damages for Mrs. Edenfield's pain and suffering, and an award to Mr. Edenfield for loss of consortium.
The medical expenses proven at trial for Mrs. Edenfield's rehospitalization and second surgery were $3,034.25. Likewise, Mrs. Edenfield proved that she was entitled to receive $3,080 for the loss of wages she suffered for a period of five months. We will award these special damages.
Dr. Vahid testified that the normal recovery period from a fistulectomy is approximately four to six weeks. Mrs. Edenfield testified that after Dr. Vahid's surgery, her condition worsened. She stated that she experienced constant pain in the rectal area and developed problems with incontinence which necessitated her use of adult diapers.
The record shows that Mrs. Edenfield is not a malingerer. Despite her continuing pain and problems with incontinence, she returned to work as a nurse's aide at the hospital on August 7, 1989. She continued working until her second surgery on October 19, 1989.
Mrs. Edenfield testified that although the recovery period following the second surgery was painful, her condition improved so that she was able to return to work on February 12, 1990. She stated that she remained in pain after the second surgery for approximately three months.
Mrs. Edenfield stated that her problems with incontinence also improved after Dr. Lindsay's surgery. At the time of trial she stated that although she still has accidents caused by her inability to fully control her bowels, she no longer has to wear adult diapers. She testified that at least two to three times per week she has to rush to the bathroom to avoid having an accident. Her last accident was on the Thursday before trial. Dr. Lindsay testified that he thought that Mrs. Edenfield would never fully recover complete bowel control and that there was a likelihood that she would continue to have some problems from time to time.
Mr. Edenfield corroborated his wife's testimony regarding her period of recovery and the post-operative effects she suffered. He likewise testified that during his twenty-five years of marriage to his wife that she has not been one to complain too much of pain; however, in the time following Dr. Vahid's surgery, Mr. Edenfield stated, "... I've never known her to complain like she did then." Mr. Edenfield candidly admitted that his sexual relationship with his wife stopped during this time, that she was unable to do housework, and that he hired a housekeeper to help with the laundry and other chores.
Based on this evidence, we find that Mrs. Edenfield is entitled to a general damage award of $150,000, and Mr. Edenfield is entitled to an award of $10,000 for loss of consortium.
For the foregoing reasons, the judgment of the trial court is reversed and set aside. IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of Gloria Edenfield and against Dr. Dara Vahid in the sum of $156,114.25, together with legal interest from date of judicial demand, until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of Walter Edenfield and against Dr. Dara Vahid in the full sum of $10,000, together with legal interest until paid.
Costs of the trial court and this appeal are assessed to Dr. Dara Vahid.
REVERSED AND RENDERED.
*1202 GUIDRY, J., dissents and assigns written reasons.
CULPEPPER, J. Pro Tem., dissents for the reasons assigned by GUIDRY, J.
GUIDRY, Judge, dissenting.
I agree with the majority that the trial court clearly erred in its determination that Dr. Vahid's use of a prolene suture, rather than a long-term absorbable suture, fell below the applicable standard of care. However, I disagree with the majority that the trial court's conclusion that Dr. Vahid's conduct (use of the prolene suture) was not a cause in fact of plaintiff's injury and damages is clearly wrong.
In a medical malpractice action, plaintiff bears the burden of establishing by a preponderance of the evidence that the treating physician's conduct was below the applicable standard of care; and, such conduct was a cause in fact of injury and damage. The learned trial judge's determination that plaintiff failed to establish the latter element by a preponderance of proof is not clearly wrong and should be affirmed.
Mrs. Edenfield's claims of continued pain and fecal incontinence following her June 1989 surgery is not supported by the medical records. No doctor observed any fecal incontinence and plaintiff's medical histories speak only of drainage from the anorectal area not of fecal incontinence. As to pain, Dr. Hovnatanian stated that, after the type of operation undergone by Mrs. Edenfield, any patient would complain of "... itching and burning and all that for months..." because of scar tissue in the area. Dr. Villemez, noting the lack of sensory nerve (pain) fibers in the anal-rectal area, stated: "I think she was inconvenienced... by her situation, but I can't testify that she was having pain. I think that is strictly a subjective thing".
In sum, neither the members of the medical review panel nor Dr. Lindsay felt the use of non-absorbable suture material in a fistula repair was appropriate. However, except for Dr. Villemez, none would opine that the use by Dr. Vahid of the single prolene suture caused Mrs. Edenfield's ongoing problems. When Dr. Lindsay operated on Mrs. Edenfield in October 1989, he found and repaired another anal fistula. During the course of that procedure, he did remove the prolene suture, however, had he only removed the suture and not done the fistulotomy, undoubtedly plaintiff's problems would have persisted.
Further, all the doctors agreed that it is not uncommon for a fistula to recur or for a patient who has had one fistula to develop another; that the "missing" of a fistula tract is not malpractice nor is the choice by a physician to employ one procedure over another. They all noted that, even in the best of hands, not all operations produce the desired or expected result. Finally, no one opined that Dr. Vahid had surgically injured plaintiff's sphincter muscles or in any other way had injured Mrs. Edenfield by his choice or execution of the procedure employed.
It is well recognized that an unsuccessful course of treatment is not per se an indication of malpractice. See Chaney v. State, Department of Health and Human Resources, 432 So.2d 256 (La.1983).
Considering that Dr. Lindsay found a second (and possibly a third) fistula when he operated, the undisputed testimony and evidence (1) that fistulas commonly recur; (2) that it is not uncommon for a person who has developed one fistula to have repeated problems; and, (3) that even in the best of hands, surgery does not always yield the desired result, I conclude that there was "... evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding ...". Canter v. Koehring Company, 283 So.2d 716 (La.1973).
For the reasons stated, I respectfully dissent.
NOTES
[*] William A. Culpepper, Judge, Retired, participated in this decision as Judge Pro Tempore by appointment of the Louisiana Supreme Court.
[1] The Edenfields have perfected five assignments of error. These assignments of error raise only one issue, that the trial court was manifestly erroneous in its conclusions.
[2] Dr. Villemez may have contradicted himself somewhat during examination by counsel for Dr. Vahid. In response to questions regarding his own use of Prolene, Dr. Villemez stated: "I use them mainly if I am working in an infected area, because it is a relatively evirt material as far as harboring any area of infection. So I use them primarily in abdominal wall closure." However, taken as a whole, Dr. Villemez was firm in his opinion that Prolene was inappropriate in anorectal surgery.