505 So.2d 821 (1987)
Van Colon HOWELL, Appellant,
v.
Dr. Marie Ann IACONA, M.D., Appellee.
No. 18513-CA.
Court of Appeal of Louisiana, Second Circuit.
April 1, 1987.
*822 Edmund M. Thomas, Shreveport, for appellant.
Mayer, Smith & Roberts by Caldwell Roberts, Shreveport, for appellee.
Before HALL, C.J., and MARVIN and NORRIS, JJ.
NORRIS, Judge.
This is a medical malpractice suit in which the plaintiff Van Howell, age 51 when the petition was filed, appeals from a judgment that granted him some recovery but denied a significant portion of the compensation he had requested. He now appeals, urging the trial court erred in failing to find that the conduct of the defendant, Dr. Iacona, was a contributing cause in fact of his infection and resultant damages. For the reasons expressed, we reverse and render.

FACTS
Mr. Howell had come to the defendant, Dr. Marie Iacona, for treatment of irregularities in his heartbeat. Defendant's practice consists of internal medicine and noninvasive cardiology. Dr. Iacona referred the plaintiff to Dr. Mike Futrell, whose practice includes invasive and noninvasive cardiology, recommending that a pacemaker be installed. Dr. Futrell inserted a pacemaker on February 4, 1983. The pacemaker had two leads that connected to a generator. Leads were placed in two of the plaintiff's four heart chambers, and the generator was implanted in the chest. Dr. Futrell reopened the chest pocket that same day to reposition a lead that was dislodged. On March 11 the pocket was again reopened by Dr. Futrell to reposition a lead. These first three operations were done in the hospital operating room under sterile procedures. On April 1, 1983 the plaintiff saw Dr. Iacona in her office, and complained to her of minor discomfort with the pacemaker pocket. Defendant's medical report shows redness of the incision line, swelling, and slightly elevated skin temperature over the pocket. While this could have been symptomatic of a local infection, Dr. Iacona was of the opinion that there was no infection, but rather an inflammation due to retention of suture fragments. Dr. Iacona supervised as her assistant used a scalpel to make a 1.5 centimeter incision in the skin at the mid-point of the previous incision, to expose the ends of the sutures. Approximately 30 to 50 milliliters of clear, amber-colored fluid were released from the pacemaker pocket as a result of the incision. Dr. Iacona testified that the fluid did not look infected, and she took no samples to culture. Dr. Iacona felt it was not necessary to suture the incision closed, as she believed that it would heal on its own by granulating in. The area was bandaged and a prophylactic *823 antibiotic was prescribed, which was intended not to treat an already existing infection but to prevent the incision she had made from becoming infected. The next appointment Mr. Howell was to have with Dr. Iacona was April 15, 1983. The plaintiff's wife testified that on April 6 she called Dr. Iacona and said that the pocket had refilled with fluid, and the pacemaker was visible. The doctor prescribed an anti-inflammatory drug and asked that Mr. Howell call back in four or five days. When he called on April 11 Dr. Iacona referred Mr. Howell to Dr. Futrell for management of the problem. Dr. Futrell hospitalized the plaintiff on that day because of a breakdown at the suture margin of the pacemaker pocket. The pacemaker generator was visibly exposed. A culture of the area was made, but the results were negative. There were no clinical signs of infection. On April 13 Dr. Harold Brown, a plastic surgeon with whom Dr. Futrell had consulted, reimplanted the pacemaker deeper beneath the pectoral muscle on the same side of the chest. Mr. Howell was released April 16. On May 5, 1983 he was readmitted to the hospital with a high fever. The cultures were positive for staphylococcus aureus, a pathogenic bacteria, signaling an infection. Mr. Howell stayed in the hospital until June 10, 1983, receiving a course of intraveneous antibiotics. On June 23, 1983 he was again hospitalized with infection. On June 24 Dr. Futrell and Dr. Brown unsuccessfully attempted to remove the pacemaker leads, but the leads were encased in scar tissue and could not be detached. On June 28 Dr. James Ciaravella, a cardiologist brought in by Dr. Futrell, performed a thoracotomy to remove the leads and inserted a new pacemaker, implanting the generator into the abdomen. Plaintiff was released August 8, 1983 and has had no complications with the new pacemaker.
The trial court found that Dr. Iacona's conduct fell below the standard of care expected in her treatment of the plaintiff. He found that this failure to comply with the expected standard of care caused the pacemaker to extrude, necessitating the operation to reposition the generator beneath the pectoral muscle. The trial judge awarded Mr. Howell $4,836.57 for special damages and $33,500 in general damages. However, he did not find that her substandard conduct caused the staph infection and plaintiff's medical difficulties subsequent to the reimplantation, which included two additional hospitalizations and a thoracotomy. The court said that the plaintiff failed to carry his burden of proof that it was Dr. Iacona's negligence, not some other occurrence, which caused the infection. The trial judge relied greatly on Dr. Robert Leachman's explanation that contamination, but not necessarily infection, had resulted from the exposure of the generator. According to the trial court's interpretation of Dr. Leachman's testimony, it would be pure speculation to try to pinpoint when the bacteria which caused the staph infection actually entered plaintiff's body.
Defendant does not appeal nor answer the plaintiff's appeal. Plaintiff's assignments of error may be consolidated into one issue: whether the trial court erred in not finding that the defendant's negligent medical treatment was more probably than not a contributing cause in fact of the plaintiff's infection, and all the resulting medical difficulties.

DISCUSSION
In a medical malpractice action, the plaintiff must show that as a result of the defendant's negligence he suffered injuries that would not otherwise have occurred. LSA-R.S. 9:2794; Hunter v. Office of Health Services, etc., 385 So.2d 928 (La. App. 2d Cir.1960), writ denied 393 So.2d 737 (La.1980). Plaintiff need not show that defendant's conduct was the only cause of the harm, nor must he negate all other possibilities; rather, he must show by a preponderance of evidence, or more probably than not, that he suffered the injury because of defendant's conduct. R.S. 9:2794; Straley v. Calongne Drayage & Storage, Inc., 346 So.2d 171 (La.1977).
The recent case of Weber v. Charity Hosp. of La., 475 So.2d 1047 (La. 1985), regulates the situation where different *824 medical procedures or different health care providers may have concurred to create or worsen the harm. Under Weber, a tortfeasor is responsible not only for injuries directly resulting from her substandard conduct, but for subsequent treatment by health care providers who seek to resolve the original harm. This is so whether or not the subsequent treatment is rendered negligently; however, if the subsequent treatment is deemed negligent, then the original physician and the subsequent ones are solidarily liable for the total harm. Weber, supra. Naturally, a plaintiff may enforce his right against any of the solidarily bound health care providers, regardless of their relative fault. LSA-C.C. art. 1795; Thomas v. W & W Clarklift, Inc., 375 So.2d 375 (La.1979).
In the instant case, the trial court found that Dr. Iacona's incision on April 1 was responsible for the breakdown of the pacemaker pocket. This procedure ultimately caused the pacemaker to extrude. This necessitated the subsequent operation to reimplant the pacemaker, and also contaminated the pocket, according to the experts. Dr. Iacona is clearly liable for the reimplantation because her acts necessitated it. As for damages resulting from subsequent treatment, Weber notes,
The damages resulting from medical treatment necessitated by the original injury may be assessed against the original tortfeasor, irrespective of whether the treatment was rendered in a negligent manner. Weber, supra at 1050.
Thus the Supreme Court is clear in holding that the risk of further injury from treatment by health care providers whose services are made necessary by the original negligent act, is within the scope of the risks foreseeable by the original tortfeasor.
The only remaining question, therefore, is causation. If the infection was caused more probably than not by either Dr. Iacona's incision or by the subsequent procedure (the subpectoral reimplantation), whether or not the doctors who performed the subsequent procedure were negligent, then Dr. Iacona is liable for the damages and treatment resulting from the staphylococcus aureus infection.
We have considered whether the evidence, taken as a whole, establishes a causal link between Dr. Iacona's incision and the infection. If the evidence of this is great enough, it will make the trial court's conclusion to the contrary manifestly erroneous. The trial court specifically found that Dr. Iacona was negligent to the extent of requiring the reimplantation of the pacemaker. Obviously the court did not feel that the surgical area was, prior to Dr. Iacona's incision, infected or broken down to the extent that the repositioning or removal was inevitable. If the court had so believed, then it would have agreed with the expert, Dr. Ciaravella, that Dr. Iacona's acts, though negligent, did not even necessitate the subpectoral reimplantation. The trial court, we believe, concluded more probably than not that the infection did not exist on April 1 and was caused by Dr. Iacona's incision or by the acts of physicians who treated the problem arising from the incision.
We admit that to decide which of these procedures actually caused the infection is, based on this record, difficult; and we note the trial court's observation, in the context of causation, that only Dr. Iacona was sued. R.p. 177. This reinforces our belief that the trial court was not aware of Weber, which was rendered after the trial and only a few months before the decision in the instant case.[1] The trial court was perhaps unwilling to extend liability to an absent defendant when he was unsure whether Iacona's actions in the re-implantation actually caused the infection. By contrast, we are constrained to examine the evidence in light of Weber.
In his opinion the trial judge relies primarily on the testimony of Dr. Leachman, an expert witness who testified by deposition. While we give great deference to the trial judge's interpretation and evaluation of witnesses who have testified before him, *825 when the witness has testified by deposition we review the evidence independently and fairly, making our own evaluation and findings of fact. First Fed. Sav. v. American Bank and Trust, 461 So.2d 341 (La. App. 2d Cir.1984); Woodard v. George Cole Chevrolet, Inc., 444 So.2d 1367 (La. App. 2d Cir.1984).
The trial judge based his decision on Dr. Leachman's assertions that it would be pure speculation to say that any one surgical procedure was more likely than any other to have caused the contamination that ultimately led to the infection. Lack of proof of which of the five suspect procedures actually contaminated the pacemaker pocket is not necessarily fatal to plaintiff's case. The exact time of the contamination is not necessarily the crucial point in this case. The experts agree that contamination does not always result in infection. Bodily defenses and medication can eradicate contamination before it culminates in infection. The trial court points out that Dr. Iacona admits in deposition that had she left the pocket alone on April 1, 1983, that no adverse effects would have resulted. Dr. Futrell was confident that he could have successfully treated any problem that existed on April 1, 1983 with medication, and no surgical intervention would have been necessary. Other experts shared this view. What Iacona did caused the pacemaker to extrude through an opening in the pocket. This situation in and of itself contaminated the pacemaker and pocket and necessitated surgical intervention. The intervention chosen was the reimplantation of an admitted contaminated pacemaker, whether contaminated prior to or after April 1 with the infection causing bacteria. If, as defendant's experts suggest, the subpectoral reinsertion caused the infection, then certainly Iacona's actions were a contributing cause because her negligent treatment directly brought about that procedure.
After evaluating Dr. Leachman's testimony, we are unconvinced by his belief that the cause of the staph infection that resulted in Mr. Howell's difficulties cannot be reasonably determined. At his deposition Dr. Leachman firmly stated that the time of the infection was definite, May 5, 1983, but that it would not be possible to establish with any degree of probability the point at which the infection-causing bacteria was introduced. While he was at one point resolute in saying that there was no way he could be persuaded to agree that any point in the case presented a greater risk of contamination than any other time, he later contradicted this position by accepting as reasonable the proposition advanced by Dr. West that the first operation entailed a potential infection risk of .5 to 1%; the second operation had a 1 to 2% risk of infection; the third invasion gives rise to a 3 to 4% risk; opening the area again during a non-sterile proceeding and failing to close it, as Iacona did, would raise the risk to 30 or 40%; and if the pacemaker were visible a few days later, then it would have a 100% risk of infection. Dr. Leachman said that he agreed that if you leave something open to the air, it is going to get infected. He also agreed that prior to Dr. Iacona's incision on April 1 there was only a 3 to 4% risk of contamination, compared to a 100% chance of contamination after that incision. We find that the trial judge was incorrect in his interpretation of Dr. Leachman's testimony. Our independent analysis convinces us that Dr. Leachman's purported belief that the time of the contamination is not capable of probable determination is enervated by his agreement with the other experts to the extent we have summarized and shall explain.
The more significant and revealing aspect of Dr. Leachman's testimony is his belief that the sepsis was caused by the subpectoral reimplantation, a procedure he felt to be unwise. He agreed that once the pacemaker had extruded, surgical intervention was necessary; however, he was adamant in his opinion was that once the pocket was opened and contaminated, the pacemaker and leads should have been replaced, not reimplanted. He felt that with reimplantation there was only a remote or unlikely possibility that the wound would heal. His opinion, when pressed to give one, was that the cause of the infection was probably the reimplantation. In sum, *826 Dr. Leachman's position is that Iacona's actions were unwise; that once the pacemaker and its pocket were opened to the air there was contamination and a great risk of infection; that something had to be done; that what was done was not the proper procedure; that the infection occurred after the reimplantation and that his reasonable assumption was that the reimplantation, a procedure he would not recommend because the contaminated wound would not heal, caused the sepsis. When Dr. Leachman's testimony is carefully evaluated we believe it translates into a belief that more probably than not the infection was caused either by the contamination that resulted from Iacona's negligent medical treatment or from the repositioning of the contaminated pacemaker.
Examining the testimony of the other medical experts who testified at trial and by deposition, we can see a clear and consistent pattern. The experts believe either that the staphylococcus aureus was more probably than not caused by Dr. Iacona's incision and the resultant breakdown and contamination of the wound, or by the subpectoral re-implantation of a contaminated pacemaker.
The defendant, Dr. Iacona, testified that in her medical judgment the pacemaker pocket was not infected on April 1. Her opinion was that the subpectoral insertion was the most likely source of the introduction of the bacteria that led to the infection. She admitted that an exposed pacemaker becomes contaminated and necessitates surgical intervention, and that the subpectoral insertion was the intervention chosen.
Dr. James Shelby, a cardiovascular and thoracic surgeon, had been consulted by Dr. Futrell on April 11. He examined Mr. Howell and recommended that the pacemaker be reimplanted subpectorally. His testimony substantiated Dr. Iacona's position that the pacemaker was not infected when she saw Mr. Howell on April 1. He testified that it was at least contaminated when they examined it on April 11, agreeing that if something is left open for a day or two or three, physicians assume that an infection is going to find it.
Dr. Futrell also agreed that the wound was a non-infected inflammation when Dr. Iacona saw the plaintiff on April 1. His opinion was that everything happened because of Iacona's actions on that day. In analyzing when the infection was caused, Dr. Futrell assigned a possible infection rate of 1% to the original operation inserting the pacemaker and said that it probably increased to 2% when they performed the second operation that same day. The March 11 repositioning of a lead would have doubled it to 4%. He further testified that the incision made by Dr. Iacona on April 1, the only procedure not performed in the hospital under sterile conditions, and the subsequent exposure to the air over the next 10 days would raise the risk of infection or at least contamination to 100%. At trial he stated that his medical opinion was that the pocket became infected during that exposure. When he saw Mr. Howell on April 11 he took a culture of the pacemaker site, which came back negative. Dr. Futrell said that while such a negative culture is not absolute proof that there is no infection, at the time it was his opinion that the wound was not grossly infected. Otherwise, he would not have attempted the subpectoral implant.
Dr. Julie Swain, an expert in general and cardiothoracic surgery, classified Dr. Iacona's incision as the probable cause of the infection, placing it at the top of the list; and then assigning as the next most probable the subpectoral insertion of April 13. However, she felt that the reimplantation was a proper procedure under the circumstances. Dr. Swain substantially agreed with Dr. Futrell's analysis of the risk of infection. She said that the initial operation had a 3% risk; the second operation on the same day would raise it to a 5 or 6% risk; and she would assign a 5% risk to the third operation. She stated that the open wound, even if it were exposed for only one day, would increase the chance of infection to nearly 100%, explaining that if the pacemaker is extruded it must be presumed to be infected.
Dr. James M. Ciaravella, Jr., an expert in general and cardiovascular surgery, performed *827 the thoracotomy on Mr. Howell. Dr. Ciaravella had been consulted by Dr. Futrell in April, and had at that time recommended removal of the existing pacemaker system, and the installation of a new sterile system. His next involvement with the case was in June, when he removed the leads and put in a new pacemaker. Dr. Ciaravella testified that the bacteria that caused the sepsis could have entered at any time. He believed that the pocket was probably infected when it was seen by Dr. Iacona on April 1, an opinion he had formed prior to seeing any medical records pertaining to the case. However, he apparently distinguished between a local infection and the sepsis that led to the thoracotomy. He testified that the probable cause of the sepsis was the replacement of the contaminated pacemaker and sealing it within the body cavity. He explained that sepsis is in itself a complication which implies the presence of bacteria in the blood. When the contaminated pacemaker was enclosed and sealed in a body cavity, it prevented the infected area from draining, resulting in sepsis.
Dr. James Eddy, a general surgeon who has neither treated nor cared for a patient's recently inserted pacemaker, was accepted by the court as an expert general surgeon. He agreed with Dr. Leachman that it would be virtually impossible to state with certainty when the bacteria which caused the infection was introduced. He places the odds at 2% when the generator was inserted; 4 to 6% when the lead was repositioned; and 20% when it was repositioned again. His opinion was that the wound was already infected when Dr. Iacona saw Mr. Howell on April 1, stating that the symptoms described indicated an infection to him.
Dr. Eddy believed the pacemaker pocket was certainly infected at the time of the reimplantation. However, when asked the ultimate question, what caused the sepsis, Dr. Eddy stated that the infection was caused by reimplanting the pacemaker in a heavily contaminated or infected wound. He felt that it was a violation of the general principles of surgery to reimplant this pacemaker. He said that one should not reinsert a pacemaker in the presence of known contamination, as the probability is that it will lead to infection. He discounted as an "extreme" possibility the theory that the sepsis was in the blood stream before the subpectoral was done, stating that it was not a probability.
Dr. Burton C. West, an infectious disease specialist, was consulted by Dr. Futrell on May 6, and subsequently treated Mr. Howell. He testified that with reasonable probability the pacemaker site was not infected before Dr. Iacona's incision, saying that the evidence that an infection existed before April 1 was almost nil. His opinion was that the wound became infected over a period of time that began on April 1, when the wound was exposed to the air. In assessing the percentages and probabilities of infection, Dr. West assigned one unit of risk to the first operation; about two units of risk to the first repositioning; and four units of risk to the second repositioning. He felt that the risk created by Dr. Iacona's incision, which was performed under non-sterile conditions, was 30 to 40%; and that if the pacemaker had actually become visible, as it had in this case, then there was virtually a 100% risk of infection. His explanation of the infection was that it spread gradually from the open site, with its raw tissue exposed, to the inner site where the pacemaker was. He said that it was certainly infected and contaminated on April 11; that at that time there was a 100% risk of contamination. Dr. West was of the opinion that Mr. Howell did not have sepsis on April 11, and implied that there was just a local infection at that time. He explained that sepsis is a complication of the pacemaker site infection, caused by a gradually building infection that spreads into the bloodstream.
Dr. Brown, an expert plastic surgeon who performed the subpectoral insertion of April 13, first saw Mr. Howell on the 11th or 12th of April. At that time he was able to see the pacemaker through the wound. Dr. Brown testified that Dr. Iacona's incision and the resulting open wound were most probably the cause of the infection, though the most likely source of the sepsis *828 was the reinsertion they performed. It was his opinion that no significant infection had manifested itself on April 1. Dr. Brown stated that at the time of reinsertion they knew it was contaminated, although they did not believe that it was grossly infected. He recognized that essentially what they did on April 13 was reimplant a non-sterile pacemaker into the subpectoral pocket, and said that the most likely source of the sepsis was this reimplantation.
The testimony of each of the experts falls into one of two categoriesthat the staph infection was more probably than not caused by Dr. Iacona's incision and the resulting open wound, or by reimplanting the contaminated or possibly infected pacemaker into the subpectoral pocket. As the Louisiana Supreme Court said in Esco v. Smith, 468 So.2d 1169 (La.1985), when the witnesses testify uniformly as to what occurred, and the trial judge misunderstands or misconstrues their testimony, there is clear error and the finding should ordinarily be reversed on appeal.
We are reluctant to overrule a trial court on a factual finding. However, we are required to review facts as well as law in civil cases. We must not only look to see that there was evidence before the trier of fact which furnishes a reasonable factual basis for the trial court's finding, but we must be sure that such a finding is not clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). This total record convinces us that the trial court was convinced that, more probably than not, the infection was caused either by Dr. Iacona's actions or by the subpectoral reimplantation. Had Weber been applied, we are confident that the result below would have been different.
We recognize that medicine is an inexact science at best, but in the courts of law we must be concerned not with concrete and irrefutable truths, but rather the proper distribution of liability, based on the preponderance of the evidence. The plaintiff's burden is not that he prove his case beyond all doubt, or even beyond a reasonable doubt, but merely by a preponderance of the evidence. A showing that his position is 51% likely is acceptable. He need not negate all viable theories, but only show that his position is more probable than not. Baker v. Beebe, 367 So.2d 102 (La.App. 4th Cir.1979), writ denied 368 So.2d 135 (La.1979). Likewise we do not require the medical experts upon whom we rely to answer unequivocally the ultimate questions of legal causation and liability, but only to provide their considered medical opinion on key issues, as a basis upon which the court makes its own determinations. The evidence in this case certainly preponderates that the staph infection resulted either from Dr. Iacona's negligent medical treatment on April 1, 1983, which caused the breakdown of the pacemaker pocket, the extrusion of the pacemaker, and at the least, contamination of the pacemaker and its pocket; or from the reimplanting of the contaminated pacemaker into the subpectoral pocket.
If Iacona's actions caused the infection, plaintiff should recover for all resulting medical procedures; if the subpectoral procedure caused the infection, then under Weber, because Iacona caused the subpectoral procedure to be done, plaintiff should also recover. Following Weber, under either theory advanced by the experts, Dr. Iacona is liable for the damages resulting from the staph infection, including hospitalizations subsequent to the reimplantation and the thoracotomy. The trial court was therefore manifestly erroneous when it found otherwise.

DAMAGES
Since the record is complete on damages, even though the trial court did not award damages for the subsequent medical treatment, we are empowered to award them. LSA-C.C.P. art. 2164; Dupree v. La. Transit Management, Inc., 441 So.2d 436 (La. App. 2d Cir.1983), writ denied 445 So.2d 1233 (La.1984).
The plaintiffs ask, and defendants do not quarrel with, $88,969.15 for the medical expenses incurred. This amount will be awarded. There is no convincing *829 evidence of any need for future medical. The record shows that the pacemaker is functioning normally at the present time, and we do not feel that the claim for future emotional counseling was sufficiently proved. There were several economic experts who testified regarding the income Mr. Howell has lost and will lose through being unable to run his corporations, Louisiana Bail Bonds and Louisiana Research. The amounts testified to vary greatly, from $135,357 to $23,136. We find that in light of the evidence presented, an award of $50,000 is a reasonable compensation for past and future lost income. Mr. Howell has suffered through a very painful ordeal, one which has caused him a great deal of mental anguish, pain, suffering, and permanent scarring. He suffered great anxiety during potentially life-threatening situations, and was hospitalized for approximately 80 days. He underwent three operations, a subpectoral insertion, an unsuccessful attempt to remove the leads, and a sternum splitting thoracotomy, as well as prolonged intraveneous antibiotic therapy. He also suffered some permanent scarring as a result of these operations. His family testified that he has become withdrawn and deeply depressed as a result of all the complications. We feel that $100,000 is a reasonable sum to compensate for the past and future pain and emotional suffering, and permanent scarring. We note that this is subject to a credit for the $38,336.57 previously awarded and paid, as well as the legal interest thereon.
We reverse the judgment of the trial court insofar as it found the defendant not liable for the infection and subsequent medical procedures. We render judgment accordingly:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the plaintiff, VAN COLON HOWELL, and against the defendant, DR. MARIE IACONA, in the amount of TWO HUNDRED, THIRTY-EIGHT THOUSAND, NINE HUNDRED, SIXTY-NINE AND .15/1.00 ($238,969.15) DOLLARS, subject to a credit of $38,336.57, with legal interest on the balance from date of judicial demand until paid, and all costs of these proceedings, including $2,750.00 taxed as costs for expert witness fees.
Costs of appeal are assessed to the defendant.
REVERSED IN PART; AMENDED AND RENDERED.
NOTES
[1] The Weber opinion was handed down September 10, 1985, after the trial of this case in July 1985, but before the trial court rendered its opinion in February 1986.