LEWIS S. DOHERTY, III, Judge.*
Robin Cole (plaintiff) sued Dr. J. Browne Larose, Jr., Redi-Med, Inc., and Insurance Corporation of America (defendants), alleging that defendant doctor was negligent in his treatment of a laceration of plaintiff’s right foot sustained while plaintiff was wading in Lake Pontchartrain and which ultimately resulted in an abscess of the right foot. Plaintiff alleged that Redi-Med, Inc., was liable for defendant doctor’s negligence as his employer, and that Insurance Corporation of America insured defendant doctor for professional liability. Prior to filing suit, plaintiff brought his complaints before a medical review panel pursuant to LSA-R.S. 40:1299.41, and the panel concluded that the evidence did not support the conclusion that defendant doctor failed to meet the applicable standard of care as charged in the complaint.
Redi-Med, Inc., answered plaintiff’s petition alleging that it was not the employer of Dr. Larose as he was an independent contractor, and therefore any negligence on the part of Dr. Larose was not Redi-Med’s responsibility. Dr. Larose answered, pleading the decision of the medical review panel specially, and generally denying liability. Insurance Company of America’s answer denied liability generally and further pled affirmatively the defense of contributory negligence of plaintiff and contributory negligence of third parties over whom it had no control.
Redi-Med moved for summary judgment, alleging that Dr. Larose was an independent contractor. The trial court granted the summary judgment, which judgment was reversed by this court on appeal. Cole v. Larose, 531 So.2d 1180 (La.App. 1st Cir. 1988) (unpublished). Prior to trial on the merits of plaintiff’s claim, Redi-Med was dismissed with prejudice by joint stipulation of the parties. The case proceeded to trial by jury. After two days of testimony, the jury found that defendant doctor did not deviate from the standard of care in his treatment of plaintiff, and judgment was entered “in favor of the defendant against the plaintiff.” The case was dismissed “in favor of defendant, against plaintiff, with prejudice, at plaintiff’s cost.” From this judgment, plaintiff appeals. Defendants Dr. J. Browne Larose, Jr. and Insurance Company of America answered the appeal.[1]
*215 Plaintiff assigns as error the following specifications: 1) that the jury erroneously rendered a verdict in favor of Dr. J. Browne Larose, Jr.; 2) that the trial judge erred in allowing testimony as to the correctness of other non-party physicians’ treatment of the plaintiff while in the hospital.
FACTS
On June 30, 1985, plaintiff was wading in Lake Pontchartrain near Mandeville, Louisiana and cut his foot, between his fourth and fifth toes, on an unidentified object in the lake. Within thirty minutes of discovering that he had cut his foot, plaintiff went to Redi-Med, an emergency care facility in Mandeville, for treatment. He was seen by Dr. J. Browne Larose, Jr., defendant. Dr. Larose x-rayed the area, observed no foreign body, or fracture, and determined that the cut should be loosely sutured after it was washed in a Betadine solution. According to his testimony, after cleaning the wound thoroughly, he placed two sutures in it loosely in order to allow it to drain and placed a dressing on it. No antibiotics were prescribed. The nurse was directed to administer a tetanus shot, and defendant testified that he told the plaintiff to go see a doctor in three to four days to check the wound, and in a week to ten days to remove the sutures. Plaintiff lived in Slidell and had no family doctor there, but told defendant he knew a doctor in Slidell.
After he left Redi-Med, plaintiff testified, he went to his girlfriend’s house and lay on the couch. It was a Sunday afternoon. Plaintiff testified he did not go to work on Monday, and on Tuesday morning, July 2, his foot was “three or four times its normal size and the color was changing.” Later that afternoon, his girlfriend took him to Highland Park Hospital in Coving-ton, where he was admitted and seen by Dr. Tom Franklin. Plaintiff stayed in the hospital until July 10.
Dr. Franklin testified that on July 2, when he first examined the plaintiff’s foot, it had significant heat and redness and swelling, which extended upward to the area of the ankle. The presumption was that he had associated infection from the original injury. The doctor classified it initially as cellulitis. Cellulitis is an infection of the area adjacent to an original injury, or an infection which has traveled through the primary layers of the skin. No abscess was diagnosed initially. A culture was taken of the discharge from the wound.
Dr. Franklin treated plaintiff for the next two days and felt that there was increasing improvement from the intravenous antibiotics he was administering. Plaintiff was also given painkillers. On the third day, the redness was persisting, there was continued swelling, and he removed the one suture remaining in the wound. It was at that time that he discovered an abscessed area and determined that the infection was deeper than originally believed. Dr. Franklin consulted Dr. Ludwig Heintz, a surgeon, to aid in further irrigation or debridement of the wound.
On July 5, 1985, Dr. Heintz performed an incision and draining of the abscess, and started the plaintiff on antibiotics. Plaintiff was given whirlpool treatments twice a day and kept his foot elevated. He was discharged from the hospital on July 10. He returned to see Dr. Heintz two days later, and again three days later, on July 15. At that time, the foot appeared to be completely healed and antibiotics were stopped. Plaintiff saw Dr. Heintz again on July 29; he had returned to work that day, but was still complaining of some pain and swelling. Dr. Heintz suggested he take another week off work, and plaintiff returned on August 5. At that time, he was told he could return to work as a lineman for CLECO.
Dr. Heintz testified, “If you have an injury down beneath the skin then you are going to have air unless it is completely closed up for some reason due to pressure or something.” The significance of air on an x-ray at the initial exam is that it shows *216 that the wound would probably have penetrated both the epidermis and the subcutaneous area of the skin. The determination whether or not to close that particular type of wound was based on the extent of the wound itself, not the x-ray. Dr. Heintz testified there were three choices of how to treat the wound: it can be cleaned and sutured, cleaned and packed open, or cleaned and left partway open with a drain. In any of the three methods, the patient could be put on antibiotics. Essentially it boiled down to a matter of the physician’s judgment whether to place the patient on antibiotics. He testified he would be worried about an injury that occurred in Lake Pontchartrain.
Plaintiff was examined by a neurosurgeon, Dr. Richard Levy, on January 25, 1988. At that time plaintiff complained of pain in the right fourth and fifth toes several times a day, with the pain occasionally radiating into the foot itself. He said it occurred when he was up on his feet for a long time, and also when he was required to climb poles in his job at CLECO. He also complained of tingling in the outer three toes of the right foot.
Upon examination, the only abnormality Dr. Levy found was reduced feeling to a pinprick, over the outer three toes and the side of the right foot. Dr. Levy testified that the distribution of the reduced feeling the plaintiff experienced upon being pricked by a pin was wider than would be normally expected for an injury between the fourth and fifth toes, because of the nerve distribution to the area injured. A loss of sensation to the third toe would be difficult to explain except possibly by a sufficient degree of swelling to extend to the third toe; however, Dr. Levy testified it was not a medical probability that the injury could have caused loss of sensation in the third toe.
Plaintiff also called Dr. Gordon Nutik to testify in his behalf. Dr. Nutik is an orthopedic surgeon who examined plaintiff on April 17, 1986. He also elicited a slight decrease in sensation to light touch with pinprick on the second through fifth toes. Other than that, the examination was negative.
Dr. Nutik testified he was provided with the records of the plaintiffs treatment in Highland Park Hospital, as well as the records from Redi-Med, a copy of Dr. Levy’s report, and the depositions of Dr. Stewart Altman, Dr. Heintz, and Dr. La-rose. He felt that the wound was most likely deep because initial x-rays revealed dark areas appearing to be air within the soft tissue, and there was later evidence of deep infection. If the dark areas did in fact represent air, then the indication would be that the laceration was more than superficial.
Dr. Nutik testified from x-rays during trial, stating that adjacent to the fourth metatarsal there was a dark area which looked like it could be air. When asked whether he would have treated the patient as Dr. Larose did, he testified that hypothesizing that there was air on the x-ray, and that, based on the subsequent history of the injury, there was a deeper infection, and further taking into account the fact that the injury was sustained in a contaminated area by an unknown object, he would not have treated the wound that way. When asked, “Would it deviate from your standard of care?” he replied, “It deviated from what I would have done for this patient.” He testified that even without addressing the question of whether antibiotics should have been administered, that there was increased risk of infection in a wound that occurred in contaminated water.
Dr. Stewart Altman testified for plaintiff as an expert in the field of emergency medicine. He saw the plaintiff on April 15, 1986. He found no definite loss of sensation in the toes, although he found that the plaintiff was incapable of flexing his fourth and fifth toes of his right foot as compared with his left foot. Dr. Altman testified that upon his review of the x-rays, he found what he thought was air between the fourth and fifth metatarsals which “would have to represent a deep puncture wound or laceration which ever phrase you want.” Had he seen the air on the x-ray, he would *217 not have treated the wound as defendant did. If he didn’t see air on the x-ray, his treatment would depend on how deep he thought the wound was. When asked whether Dr. Larose breached the standard of care by treating it as he did, he replied, “I would think that almost anyone that had experience with significant amount of soft tissue injuries who saw air on the x-rays would not have closed it up.” Even if the treating doctor thought the wound was superficial, “leaving it open in general would have been a better thing to do.”
Dr. Joseph A. Sabatier, Jr., a member of the medical review panel, testified on behalf of defendant as an expert in general surgery and emergency medicine. Dr. Sa-batier completed his residency in surgery in 1942 and practiced surgery and emergency medicine until his retirement in 1988. He testified that the medical review panel did not have access to the x-rays at the time it made its determination that the emergency care rendered by Dr. Larose to the plaintiff did not show any evidence of negligence on Dr. Larose’s part. However, he subsequently reviewed the x-rays himself and had reviewed them the day of the trial. He testified that it was the opinion of the panel that, considering the history given by the plaintiff concerning how the wound was sustained, and the fact that the wound was explored and irrigated thoroughly and was loosely sutured, there was no impropriety in placing the sutures as Dr. Larose did. The decision whether to prescribe antibiotics, and whether to leave a wound open or suture it, is a matter of physician judgment, according to Dr. Sabatier.
In performing an x-ray in this situation, Dr. Sabatier testified that one would look for the presence of a foreign body, or fractures, and for the presence of gas or any abnormality of the soft tissue. In reviewing the x-rays the day of the trial, Dr. Sabatier testified to the jury that he saw no evidence of a fracture, a foreign body or air in the soft tissue.
Under cross-examination, he reviewed the x-rays on the stand, and was asked to describe what a black spot on the x-ray represented. He responded that he could not make out the black spot. When the plaintiff’s lawyer asked, “Do you see where I’m pointing?”, Dr. Sabatier replied, “Are these the same x-rays that I was looking at?” On re-direct, he testified that he saw no evidence of air on the x-rays, but that even if it were present it would not alter the course of treatment because it could have occurred as a result of an open wound and would not indicate an infection at that time.
Dr. Larose testified that he obtained his medical degree from LSU Medical School in 1951 and was board-certified in family practice in 1970. He practiced emergency medicine for approximately twelve years, and devoted his practice solely to family practice for approximately twenty-two years. He now practices a combination of family medicine, emergency medicine and industrial medicine.
Dr. Larose’s initial examination of the plaintiff showed that plaintiff had a laceration between the fourth and fifth toes transversely between the two toes. According to the doctor, it was about one-eighth inch long, or one-fourth inch long at the most, and he could see the bottom of the wound, which was maybe an eighth of an inch deep. He cleaned it off and soaked it in Betadine for approximately ten minutes, and then x-rayed. He saw no foreign body or fracture and therefore the patient was brought back to the treatment room. Dr. Larose put gloves on and cleaned the foot well, swabbing out the inside of the wound after injecting a local anesthetic in it. He testified he was hardly able to go deeper than one-eighth inch into the wound. He determined that it looked clean and decided to go ahead and suture it loosely because of the location; every time the toes came together, the wound was likely to gape open. Before suturing he inserted a hemostat probe to make sure there was no break in the tissue which separates the skin layers from the subcutaneous tissues, and found no break.
Dr. Larose testified that there were three reasons for having x-rays made in this ease: to determine if there was a fracture, a retained foreign body, or air in the *218 tissues. He testified that he discovered no air; he didn’t think it was there. There were irregularities between the fourth and fifth metatarsals and also between the second and third metatarsals; there were also some “little spotty areas” throughout the film he couldn’t identify. He didn’t think the irregularities were air.
He testified that he sutured the wound because it was clean and if left unsutured would take from three to four weeks to heal, and there was a good chance of an infection because of the location; therefore, he sutured it loosely to allow drainage. He did not feel antibiotics were indicated. He testified there was always the chance of an allergic reaction to antibiotics; also, if the antibiotics were not taken as indicated, the bacteria present could develop a resistance.
The plaintiff and his wife both testified concerning the injury and subsequent treatment administered by Dr. Larose. Plaintiff testified that Dr. Larose told him to go home, keep his foot dry and stay off it for a day or two. He testified that Dr. Larose did not tell him to see his family physician; in fact, plaintiff did not have one and had last been to a doctor when he was nine or ten years old. At the time of the accident, the plaintiff was thirty years old.
Plaintiff testified he missed about six weeks of work as a lineman for CLECO, or about 278 hours. He had been working for CLECO since he was seventeen years old. He earned $11.81 an hour.[2] He testified that he still had, at the time of trial, pains in his foot on and off and he had pain in it when he climbed a pole. His foot would “go to sleep” after he had been up on the pole fifteen or twenty minutes and he would have to kick it on the pole so he could climb down. He also testified he had three toes which he could not bend under. Although his job no longer required him to climb poles all day, he still had to climb poles on occasion. Since the accident, he had been promoted two times and at the time of trial was a lead lineman. No one at CLECO had been heard to complain that plaintiff was not physically capable of doing his job.
Plaintiff’s wife (girlfriend at the time of the accident) testified that Dr. Larose gave plaintiff no instructions other than to keep the foot dry. She took him to the hospital on the third day after the accident because his foot “looked odd.” During the interval between the accident and the day he went to the hospital, plaintiff spent all his time lying on the sofa in the living room. He was in pain and on each occasion when she slipped the dressing aside to examine the wound, his foot looked worse.
LAW
Plaintiff’s burden of proof in this action is set forth under LSA-R.S. 9:2794. He must prove the degree of care ordinarily practiced by physicians within the involved medical specialty, in this case emergency care; he must prove that the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill; and that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred. LSA-R.S. 9:2794A(1). Plaintiff’s first assignment of error is that the jury erroneously rendered a verdict in favor of defendant doctor. In considering this assignment of error, we must apply the manifest error standard of review: unless the verdict is clearly wrong and manifestly erroneous, we may not disturb the jury’s finding on appeal. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Plaintiff argues that the jury’s verdict in favor of the defendant had no reasonable basis. To support this argument, he points to the testimony by Dr. Nutik and Dr. Altman that the plaintiff’s wound was deep. Dr. Altman testified that if he had *219 seen the air on the x-rays, he would not have treated the plaintiffs wound as Dr. Larose did. Dr. Nutik testified that, hypothesizing air on the x-ray and the subsequent history of a deep infection, together with the knowledge of the location where the wound was sustained, Dr. Larose’s treatment deviated from what he would have done for plaintiff.
However, Dr. Heintz, who also testified for plaintiff and who treated the plaintiffs abscess at Highland Park Hospital, testified that the determination whether or not to suture the wound rather than leave it open would be based on the appearance of the wound itself, not on the x-rays. Defendant’s expert, Dr. Joseph Sabatier, likewise testified that the appearance of air on an x-ray could signify an open wound, not necessarily an infection. Dr. Larose, who saw the wound initially before the abscess had appeared, testified that the wound was not more than one-eighth inch deep. He did not believe that the dark areas testified to by other doctors as air on the x-rays did in fact indicate that air was present.
The jury found that plaintiff failed to carry his burden of proof that Dr. Larose’s treatment of him failed to meet the applicable standard of care. There was no testimony that Dr. Larose was negligent in failing to recognize air on the x-rays. The evidence was not conclusive that air was in fact present on the x-rays, and Dr. Altman’s and Dr. Nutik’s testimony that they would have treated the patient differently was hypothesized on the presence of air on the x-rays. Simply because one doctor testifies he would have treated the patient in a different way does not necessarily infer negligence on the part of a doctor who treated the patient in yet another way. Cable v. Cazayou, 351 So.2d 797 (La.App. 1st Cir.1977).
Plaintiff also argues that the wound failed to drain properly and therefore Dr. Larose’s decision to place loose sutures in it must be called into doubt. Plaintiff attempts to infer from Dr. Franklin’s testimony that he saw no drainage in the wound when plaintiff was admitted to Highland Park Hospital, and from the subsequent deep abscess development, that Dr. Larose did not in fact allow for drainage. However, the hospital records indicate that a culture was taken from plaintiff’s wound at the time of admission on July 2. We are not persuaded by this argument that the jury was clearly wrong in finding that Dr. Larose was not negligent. There was sufficient evidence before the jury to furnish a reasonable basis for its conclusion that Dr. Larose acted reasonably under the circumstances. Matthews v. Louisiana State University Medical Center, 467 So.2d 1238 (La.App. 2d Cir. 1985); Reid v. North Caddo Memorial Hospital, 528 So.2d 653 (La.App. 2d Cir. 1988). We will not disturb those findings, even if other conclusions from the same evidence are equally reasonable. Reid v. North Caddo Memorial Hospital, 528 So.2d 653, at 657.
Plaintiff’s second assignment of error concerns the trial court’s introduction of testimony offered by the defendant tending to show that subsequent treatment by the doctors at Highland Park Hospital might have caused or contributed to plaintiff’s infection. At trial, plaintiff objected to the introduction of such evidence on the grounds that it was an enlargement of the pleadings. The trial judge allowed the evidence on defendant’s motion in limine, reasoning that the jury should be allowed to decide the question of any fault of third parties. The trial judge went on to say, “... let’s say that we have a negligent motorist on the road that creates an accident and then a doctor maybe does something that is not up to the standard of care that prevails in the community, the negligent motorist can’t escape his liability for all the injuries ..." The jury interrogatories also included questions as to the fault of third parties, the trial judge reasoning that “I don’t think that there is a prima facie case having been established of third party negligence in this case ... at the same time, when we deal with negligence ... it has got to total one hundred percent.”
Plaintiff argues that the jury was unduly confused by the admission of evidence re *220 lating to third party fault, and by the inclusion of questions concerning third party fault in the jury interrogatories. We cannot agree. In the first place, third party fault was pleaded by defendant Insurance Company of America in its answer, and therefore there was no enlargement of the pleadings. LSA-C.C.P. art. 1154. Secondly, we agree with the trial court that the evidence was relevant both as to third party fault, pursuant to LSA-C.C.P. art. 1812, and also as to the question of negligence on the part of defendant. Howell v. Iacona, 505 So.2d 821 (La.App. 2d Cir.1987). Further, as defendant argues, part of the plaintiffs cause of action is that his injuries were proximately caused by the fault of the defendant; therefore, the issue was raised by plaintiff’s petition, if not by the subsequent answer of Insurance Company of America. Whether evidence is relevant or not is within the discretion of the trial court and its ruling will not be disturbed absent an abuse of discretion. Citizens Bank & Trust v. Consolidated Terminal Warehouse, Inc., 460 So.2d 663 (La.App. 1st Cir.1984). We find no merit to plaintiffs second assignment of error.
The judgment of the trial court is affirmed. All costs are to be assessed to plaintiff.
AFFIRMED.

 Judge Lewis S. Doherty, III, retired, is serving as Judge pro tem. by special appointment of the Louisiana Supreme Court to fill the vacancy created by the temporary appointment of Judge Melvin A. Shortess to the Supreme Court.

. We note that there is no final judgment against Insurance Company of America, and therefore it has not yet been dismissed from the lawsuit. LSA-C.C.P. art. 1841. Technically, *215 plaintiff's appeal against Insurance Company of America, therefore, cannot stand. The trial court has no authority to amend the judgment to include Insurance Company of America. LSA-C.C.P. art. 1951; Levy v. Stelly, 230 So.2d 774 (La.App. 4th Cir. 1970).

. Although plaintiff testified as to the hours he missed from work and the hourly wage he was paid, we find no evidence in the record of the total wages lost. Defendant’s counsel objected at trial to plaintiffs counsel totalling the wages himself, and the objection was sustained. However, no stipulation was entered nor were any wage records introduced at trial.