STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-607


RONALD AND PEGGY BIANCHI

VERSUS

DR. ERNESTO KUFOY


**********

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. C-2004-0884
HONORABLE MARTHA ANN O'NEAL, DISTRICT JUDGE

**********

OSWALD A. DECUIR
JUDGE

**********

Court composed of Sylvia R. Cooks, Oswald A. Decuir, and Elizabeth A. Pickett,
Judges.


**REVERSED AND RENDERED.**

Caleb H. Didriksen
Richard J. Garvey
Amanda K. Wingfield
Didriksen Law Firm
3114 Canal Street
New Orleans, LA 70119
(504) 586-1600
Counsel for Plaintiffs/Appellants:
    Ronald and Peggy Bianchi

J. Gregory Bergstedt
Jodi C. Andrews
Fraser, Wheeler & Bertstedt
P. O. Box 4886
Lake Charles, LA 70606-4886
(337) 478-8595
Counsel for Defendant/Appellee:
    Dr. Ernesto Kufoy

**DECUIR, Judge.**

Ronald Bianchi and his wife, Peggy Bianchi, filed this medical malpractice suit against Dr. Ernesto A. Kufoy following Mr. Bianchi's cataract surgery in October of 2002. A jury found Dr. Kufoy had breached the appropriate standard of care in his treatment of Mr. Bianchi but, finding no proof of causation, failed to award damages. The trial court denied the plaintiffs' motions for judgment notwithstanding the verdict and new trial. For the following reasons, we find that a reasonable factual basis does not exist to support the jury verdict and that the record establishes the jury verdict is clearly wrong and manifestly erroneous. Accordingly, we reverse the jury verdict and render judgment.

On October 30, 2002, Ronald Bianchi was admitted to Beauregard Memorial Hospital for the surgical removal of a cataract and implantation of an artificial lens in his right eye. The surgeon, Dr. Ernesto Kufoy, is an internist who, at the time of this procedure, devoted a small part of his practice to ophthalmology and cataract surgery. The intended surgery was to include the emulsification of the cataract and retention of the lining of the old lens in order to support the posterior placement of the new artificial lens. During the surgery, a complication arose whereby Dr. Kufoy tore the lining of the old lens and was therefore unable to use that lining to support the new lens. Such complication is a known risk of surgery, and the expert testimony showed it can occur in the absence of negligence. In anticipation of this possible complication, Dr. Kufoy had available a different artificial lens which he placed in the anterior portion of the eye, a procedure which the expert testimony agreed was appropriate under the circumstances.

When Mr. Bianchi appeared for his post-surgery appointment the following day, he complained of pain, and Dr. Kufoy determined that his vision was 20/200 in

the right eye. Dr. Kufoy also found "iris capture," a condition where the new lens pokes through or attaches to the iris, but is, Dr. Kufoy testified, "without consequence" to the patient. Dr. Kufoy did not investigate the source of the pain or the loss of vision as he did not regard either symptom to be unusual. During the next three days, however, Mr. Bianchi's pain intensified, and he attempted to contact Dr. Kufoy, who was in Houston yet had no one in DeRidder to take calls for him over the weekend. They finally spoke on Sunday, November 3, and Dr. Kufoy called in a prescription for hydrocodone to alleviate the pain.

Dr. Kufoy then saw Mr. Bianchi in his office on November 4, 2002. His eye was red, swollen, and painful; Mr. Bianchi testified that he could not see out of it. Dr. Kufoy gave the patient a shot of Demerol, examined the anterior part of the eye, and diagnosed closed-angle glaucoma. In an effort to restore the flow of fluid through the eye, he performed a peripheral iridotomy and sent Mr. Bianchi home without determining if the procedure was in any way successful. Over the next several days, the patient continued to experience pain and diminished vision, but he was unable to reach Dr. Kufoy by phone. On November 11, he appeared at Dr. Kufoy's office, where a cursory examination was done; he was then referred to a specialist in Houston. Throughout his treatment of Mr. Bianchi, Dr. Kufoy neglected to properly chart the patient's complaints or his findings, so that his testimony in open court seven years after the surgery was unsupported by the medical records available.

Dr. Jeffrey Lanier, a cornea specialist, saw Mr. Bianchi on November 14, 2002. At that point, the patient's vision was classified as "light perception only," or one step away from total blindness in the right eye. The pressure in the eye was very low, the cornea was swollen, and the iris was pushed forward into the cornea. Both cataract

2

material and vitreous were found in the eye, leftover from the surgery. The artificial lens was out of place behind the iris, movement which may have occurred spontaneously. Most important, Dr. Lanier diagnosed "kissing choroidals," which is a significant hemorrhage in the choroid or vascular tissue that nourishes the retina. Dr. Lanier disagreed with Dr. Kufoy's earlier diagnosis of closed-angle glaucoma and the need for a peripheral iridotomy. He opined that the hemorrhage most likely began during the original cataract surgery by Dr. Kufoy. He referred Mr. Bianchi to Dr. Bailey Lee, a retina specialist, who performed a procedure to drain the hemorrhage on November 18. Over the next several years, Mr. Bianchi underwent multiple eye surgeries and, after a few periods of some improvement, has now been left with virtually no vision in the right eye.

At the risk of oversimplification, we have distilled the medical evidence to the following conclusions: The choroidal hemorrhage caused scarring and other damage to the retina which cannot be corrected, and the swelling and distortion of the iris, which resulted from both the hemorrhage and other problems, damaged the cornea, required a corneal transplant, and ultimately led to the failure of the transplant. Several questions remain, however, including whether this scenario is a foreseeable risk of cataract surgery or whether Dr. Kufoy's treatment, or failure to treat, caused this disastrous chain of events.

The Bianchis first submitted their claim for malpractice to a medical review panel. The panel found malpractice on the part of Dr. Kufoy and issued the following reasons for its opinion:

> After careful review of all documents submitted for our review, it is our opinion that the case of Ronald Bianchi, the complainant, administered by Dr. Ernesto A. Kufoy, was substandard medical care and treatment. The patient should have been followed more closely

3

post-operatively by Dr. Ernesto A. Kufoy, and after having been seen on Monday, November 4, 2002, the patient should have been referred to a specialist. Dr. Ernesto A. Kufoy misdiagnosed the complainant and failed to properly diagnose the problems which were diagnosed in Houston once referral was made as of November 11, 2002.

The evidence supports the conclusion that the defendant, Dr. Ernesto A. Kufoy, failed to meet the applicable standard of care as charged in the complaint and the conduct complained of was a factor in the asserted resultant damages. The Committee has insufficient evidence to determine any disability and the extent direction [sic] disability suffered by the plaintiff and whether or not there was any permanent impairment and the percentage of said impairment suffered by the plaintiff.

The case then proceeded to a jury trial in December of 2009. The jury determined that Dr. Kufoy breached the standard of care required of him in his treatment of Mr. Bianchi. Nevertheless, the jury found Dr. Kufoy's breach of the standard of care did not cause injuries to Mr. Bianchi. Consequently, no damages were awarded, and the trial court denied the plaintiffs' motions for JNOV and new trial. The trial court, in written reasons, briefly reviewed the expert testimony and concluded that there was sufficient disagreement among the experts that the jury could have found either way on the question of causation. The trial court also reiterated its earlier decision to exclude the plaintiffs' requested jury instruction on the doctrine of *res ipsa loquitur*, finding the doctrine inapplicable to the facts of this case.

In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and must then establish a causal relationship between the alleged negligent treatment and the injury sustained. LSA-R.S. 9:2794; *Smith v. State through DHHR*, 523 So.2d 815, 819 (La.1988); *Hastings v. Baton Rouge General Hospital*, 498 So.2d 713, 723 (La.1986). Resolution of each of these inquires [sic] are determinations of fact which should not be reversed on appeal absent manifest error. *Housley*

*v. Cerise*, 579 So.2d 973 (La.1991); *Smith*, 523 So.2d at 822; *Rosell v. ESCO*, 549 So.2d 840 (La.1989); *Hastings*, 498 So.2d at 720.

*Martin v. E. Jefferson Gen. Hosp.*, 582 So.2d 1272, 1276 (La.1991).

The record before us contains undisputed evidence of Dr. Kufoy's breach of the standard of care. Based on this evidence, both the medical review panel and the jury found proof of medical negligence. The question before us now is whether that negligence caused the damages suffered by Mr. Bianchi. The evidence of damages is likewise undisputed. At the time of trial, Mr. Bianchi's vision in the right eye was classified as light perception only. Therefore, it is only the link between the proven medical negligence and the proven damages which we must examine.

In reviewing this record, we must examine the totality of the evidence to determine whether the judgment is plainly wrong:

> The plaintiff need not show that the defendant's conduct was the only cause of her harm, nor must she negate all other possibilities; rather, she must show that more probably than not she suffered injuries because of the defendant's conduct. *Straley v. Calongne Drayage & Storage, Inc.*, 346 So.2d 171 (La.1977). In other words, the plaintiff's burden is not to prove her case beyond all doubt or even beyond a reasonable doubt, but merely by a preponderance of the evidence, or 51%; she need not negate all viable theories, but only show that her position is more probable than not. *Howell v. Iacona*, 505 So.2d 821 (La.App.2d Cir.1987).

> . . . .

> When different medical procedures are involved, the defendant is liable not only for the original harm resulting from his substandard conduct, but for subsequent treatment that seeks to resolve the original harm. *Weber v. Charity Hosp. of La.*, 475 So.2d 1047 (La.1985); *Howell v. Iacona*, *supra*.

> Under the appropriate standard of review, we do not consider only so much of the evidence as will uphold or undermine the judgment, but rather the whole of the evidence with an eye to determining whether the judgment is plainly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989).

*Elliott v. Robinson*, 612 So.2d 996, 1006 (La.App. 2 Cir. 1993).

5

In written reasons for judgment denying the plaintiffs' post-trial motions, the trial court focused on Dr. Kufoy's actions at the time of the cataract surgery. However, whether Dr. Kufoy was negligent in tearing the lining of Mr. Bianchi's lens is not the pertinent question. Nor is it relevant to try and determine if the choroidal hemorrhage started during surgery as a result of Dr. Kufoy's substandard technique or simply from a known complication of cataract surgery. Neither of these possibilities can be determined from the medical records. Rather, the focus must be on the post-surgical care of Mr. Bianchi who exhibited unusual symptoms of pain, swelling, redness, and loss of vision. It was Dr. Kufoy's failure to determine the cause of those symptoms, and his failure to either treat those symptoms or issue a referral to a specialist, that give rise to the theory of a lost chance for a better outcome.

"[M]any medical malpractice cases, especially those in which causation is truly at issue, involve the loss of a chance of survival or of a better chance of recovery." *Graham v. Willis-Knighton Med. Ctr.*, 97-188, p. 15 (La. 9/9/97), 699 So.2d 365, 372. In the case of *Hargroder v. Unkel*, 39,009 (La.App. 2 Cir. 10/29/04), 888 So.2d 953, 957-58, *writs denied*, 04-2908, 04-2909 (La. 2/4/05), 893 So.2d 874, the second circuit held:

> The damage claimed in this case, loss of a chance of a better medical outcome, has its basis in cases dealing with loss of a chance of survival. *Smith v. State Department of Health and Hospitals*, 95-0038 (La. 6/25/96), 650 So.2d 1167. The issues in a loss of a chance of survival case are whether the tort victim lost any chance of survival because of the defendant's negligence and the value of that loss. The question of degree may be pertinent to the issue of whether the defendant's negligence caused or contributed to the loss, but such a tort-caused loss in any degree is compensable in damages. In such cases, the factfinder is to focus on the chance of survival lost on account of malpractice as a distinct compensable injury and to value the lost chance as a lump sum award based on all the evidence in the record, as

6

is done for any other item of general damages. *Smith v. State Department of Health and Hospitals, supra*.

In contrast to the instant case, the medical malpractice case of *Gust v. Brint*, 577 So.2d 1012 (La.App. 4 Cir.), *writ denied*, 580 So.2d 383 (La.1991), focused on negligent pre-operative care, rather than post-operative care. The focus of the causation issue, the court determined, was not whether the negligence caused the plaintiff's disease, but rather, whether the negligence caused an increased risk of harm to the plaintiff:

> [H]ad Dr. Brint not been negligent in his pre-operative care, blepharoplasty would not have been performed, and thus she would not have had the complications she subsequently experienced. Thus the correct inquiry for our determination is not whether the blepharoplasty caused the onset of Graves disease, but whether it increased the risk of harm to Gust following the onset of that disease.

*Id*. at 1022.

The plaintiffs have offered eleven acts or omissions which they contend constitute the medical negligence of Dr. Kufoy. These include surgical techniques criticized by their expert, inadequate post-operative examinations and communication with the patient, and the failure to refer Mr. Bianchi to a specialist earlier. The opinions offered by the medical experts on the choroidal hemorrhage varied on the question of when it began, but they generally agreed that he was suffering from a hemorrhage on Monday, November 4, that was not diagnosed until November 14. Only Dr. Louis Kasner, the defendant's expert, declined to state when or how he thought the hemorrhage could have occurred, instead suggesting remote possibilities such as a child's finger or a deep cough, none of which were supported by any facts in the record. Dr. Kasner did, however, explain the benefit of a surgeon's recognition of a hemorrhage: "[I]f a surgeon recognizes that there might be a hemorrhage going

7

on posteriorly, he can rapidly close the eye to seal it. And that will stop the hemorrhage. . . ."

Exactly which acts of alleged negligence the jury agreed with are indeterminable. We cannot, however, look at any one act in isolation but must consider the evidence as a whole. Accordingly, when viewing the totality of the evidence, we find sufficient proof that Dr. Kufoy's negligence took away or diminished Mr. Bianchi's chance for a better recovery from the traumatic and complicated cataract surgery. The plaintiffs' claim for damages directly relates to that negligence.

In reversing summary judgment in favor of a defendant who admitted negligence but disputed causation, the supreme court held:

> Causation is an issue of fact that is generally decided at the trial on the merits. As the dissenting judge on the intermediate court noted, the admitted negligence clearly caused some damages, even if it merely hastened the amputation by one day. Plaintiff's damages for pain and suffering during the period of negligence, for aggravation of her medical condition, and for loss of any chance of saving her foot or of delaying the amputation is more appropriately decided by trial on the merits. . . .

*Estate of Adams v. Home Health Care of La.*, 00-2494, pp. 1-2 (La. 12/15/00), 775 So.2d 1064, 1064-1065. The second circuit held similarly in *Tillman v. Eldridge*, 44,460 (La.App. 2 Cir. 7/15/09), 17 So.3d 69.

"Although we are always reluctant to overrule a jury's verdict, the jury's decision in this case was manifestly erroneous." *Fusilier v. Dauterive*, 00-0151, p. 9 (La. 7/14/00), 764 So.2d 74, 81. We, too, hesitate to overrule a jury's finding but must do so in this case.

Regarding damages, the plaintiffs have requested an award for past and future medical and related expenses in the amount of $176,333.84 and general damages of

8

$2,150,000.00, subject to the Louisiana Medical Malpractice cap of $500,000.00. The record before us is complete; therefore, we are able to discern an appropriate amount of damages without remand to the trial court. We have reviewed the evidence in detail. Mr Bianchi's past medical and medical-related transportation expenses are roughly $75,000.00. Dr. Lanier discussed future medical care for Mr. Bianchi and did not recommend any future surgeries, only periodic examinations and symptom-relief medications. The evidence as a whole does not indicate that Mr. Bianchi's future medicals will approach that which he has already incurred. Therefore, we award $100,000.00 in past and future medical care and related expenses.

We also award general damages to Mr. Bianchi and loss of consortium damages to his wife. Mr. Bianchi has virtually no vision in his right eye. Prior to the surgery, he was a pilot and enjoyed riding his motorcycle. His activities have been greatly curtailed, and this has affected their marital relationship. Consequently, we fix general damages at $300,000.00. *See*, *Reider v. State of La.*, 04-1403 (La. App. 3 Cir. 3/9/05), 897 So.2d 893, *writ denied*, 05-938 (La. 5/20/05), 902 So.2d 1056; *McPherson v. Lake Area Med. Ctr.*, 99-1876 (La.App. 3 Cir. 5/24/00), 767 So.2d 102, *writ denied*, 00-1928 (La. 9/29/00), 770 So.2d 353. Accordingly, we have concluded that a total award of $400,000.00 will adequately compensate the plaintiffs for their general and special damages. We need not address any other issues raised in this appeal.

For the above and foregoing reasons, the judgment of the trial court is reversed and rendered. Costs of this appeal are assessed to the defendant.

**REVERSED AND RENDERED.**